**INDEPENDENT OIL WORKERS UNION, LOCAL 117, Plaintiff,**

v.

**AMERICAN OIL COMPANY, Defendant.**

**No. W–3589.**

United States District Court
D. Kansas.

Feb. 14, 1969.

Frank Hylton, Wichita, Kan., Green, Powers, Belshaw & Danko, Whiting, Ind., for plaintiff.

Lilleston, Spradling, Gott, Stallwitz & Hope, Wichita, Kan., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., Donald L. Hastings, Chicago, Ill., for defendant.

## OPINION OF THE COURT WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

THEIS, District Judge.

This is an action brought by plaintiff labor union against defendant company under Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185, to compel arbitration under the provisions of a collective bargaining agreement in existence between the two parties. The matter is now before this Court upon the pleadings, a pre-trial order, the evidence after trial before the Court, and arguments of the parties both at the close of the trial and later at the time of submission of final briefs of the parties.

## FINDINGS OF FACT

1. The plaintiff, Independent Oil Workers Union, Local 117, is an unincorporated labor organization and is engaged in representing employee members in collective bargaining with the defendant, American Oil Company, a Maryland corporation, conceded to be an employer in an industry affecting commerce, as defined in Section 301 of the Labor Management Relations Act, as amended. The defendant owns and operates a refinery located in Neodesha, Kansas, where members of plaintiff union are employed.

2. The plaintiff and defendant are parties to a contract (Plaintiff's Exhibit 4) executed on October 22, 1965, which was in effect on November 1, 1965, and at all times material to this action, relating to hours, wages and other conditions of employment of employees within the collective bargaining unit represented by the union.

3. Article II of the contract establishes a "Grievance Procedure" covering each "question upon which an employee wants consideration through the union * * *." Article II of the contract provides for "negotiations" of the "question" between union and company representatives at ascending levels of authority. Section 2.10 of Article II of the contract provides that "[i]f a question as defined in Section 2.11 of this Article" is not settled as a result of these negotiations, the parties "may refer the subject for arbitration * * *." Section 2.11 of Article II of the contract provides:

"Section 2.11:

"A. Questions which may be referred to arbitration shall be limited to:

1. Questions directly involving or arising from applications, interpre-

tations, or alleged violations of the terms of this agreement.

2. Questions directly involving or arising from applications, interpretations, or alleged violations of the terms of arbitration awards and written agreements not incorporated in this Agreement.

3. Questions or applications, or interpretations of or alleged noncompliance with past policies, practices, customs or usages relative to working conditions and grievances, arising from:

a. The modification by the Company of said policies, practices, customs and usages.

b. The discontinuance by the Company of any of said policies, practices, customs and usages.

c. The establishment by the Company of new policies, practices, customs or usages during the term of this Agreement.

"B. Grievances or disputes relating to new classifications, rates of pay, hours of employment, and other conditions of employment not expressly provided for by this Agreement or any written side agreement or arbitration award shall be subject to bargaining by the parties during the term of this Agreement, but either party shall have the right to refuse to submit to arbitration any grievance or dispute not covered by Paragraph A, of this Section 2.11. In the event of a refusal by the Company to arbitrate an issue under the terms of this paragraph, Article XI, Stoppage of Work, of this Agreement, shall be suspended with respect to that issue only, beginning on a date thirty (30) days subsequent to the date of such refusal. Said suspension shall continue for a period of sixty (60) days, or if a work stoppage actually commences within the period during which Article XI, Stoppage of Work, is suspended then the suspension shall continue until a settlement of that issue is reached.

"C. It is understood and agreed, however, that proposals to add to or change this Agreement shall not be arbitrable and that no proposal to modify, amend, or terminate this Agreement and no matter or subject arising out of or in conjunction with any such proposal, may be referred to arbitration under this Section 2.11."

Section 11.1 of Article XI of the Contract provides:

"Section 11.1

"The Company agrees that during the life of this Agreement, and/or any period of negotiation for amendment or renewal, there shall be no lockouts of employees, and the union agrees that there shall be no strikes, slowdowns or stoppages of work while this Agreement is in effect, and/or during any period of negotiations for amendment or renewal thereof subject to the provisions of Section 2.11 of Article II, * * *"

4. On November 5, 1965, the plaintiff filed and presented to the defendant a grievance, which stated:

"On November 1, 1965, the Company started using 3 men per shift at the Fluid Cracking unit instead of the usual 4 men per shift which is in direct violation of past practice at the Neodesha refinery.

"The Union, therefore, requests that the Company refrain from the practice of using 3 men per shift and reassign 4 men per shift at the Fluid Cracking unit and that the eligible Labor Department Employees be properly compensated."

5. The plaintiff and defendant negotiated with respect to the question presented by the plaintiff's grievance at each step of the grievance procedure, as provided for in the collective bargaining contract, but the question was not settled as a result of these negotiations. On November 18, 1965, the plaintiff filed with the defendant its notice to arbitrate the matter. The defendant refused to arbitrate. The present action

was initiated on February 28, 1966, following defendant's refusal.

6. Before the execution of the 1953 collective bargaining contract, there was no clause calling for arbitration of policies, practices, customs or usages, but, instead, a relatively broad grievance procedure which resulted in arbitration of virtually every dispute between management and labor. It is agreed between the parties that the language of the 1953 contract, relative to the use of arbitration as a device for settlement of disputes, put a limitation on what disputes might be resolved by the arbitral process.

7. The provisions of Section 2.11 have appeared in substantially that form and wording in every contract between the parties beginning with the contract executed by them on May 22, 1953.

8. The provisions of Section 2.11 have also appeared in substantially that form and language in every contract between defendant company and Independent Petroleum Workers of America, Inc., Local 1, another local union of the same national union of the plaintiff-union here, covering a similar collective bargaining unit of employees at the Company's Whiting, Indiana, refinery, beginning with a collective bargaining agreement executed on August 30, 1952. In fact, the provisions of Section 2.11 here before the Court were copied from that August 30, 1952 contract at Whiting, Indiana.

9. Essentially, the use of four non-supervisory employees per eight-hour shift in a three-shift day on the fluid catalytic unit, popularly known as the "cat cracker," began at the Neodesha refinery in 1953 and continued until November 1, 1965, when the change in crew size complained of by plaintiff occurred.

10. The uncontroverted physical description of the size of the "cat cracker" unit by witness Gibson, one of the crew, was to the effect that it was a large, complex, chemical-reaction unit eleven stories high, of which one of the cooling towers was 200 yards from the control house, covering an area of 100 yards by 75 yards, which caused the crew to operate over a large horizontal ground-level area as well as vertical areas with multi-level horizontal working areas. The "cat cracker" unit uses large vessels, fractionating columns, many pumps, exchanges and auxiliary systems, including a hydraulic system to operate slide valves, pumps and compressors with its auxiliary equipment. Plaintiff's Exhibits 5, 6, 7 and 8 are pictures of various parts of the "cat cracker" unit.

11. The purpose and operation of the "cat cracker" unit in the refining process of petroleum was described as taking the heavy crude oil from the crude unit, and by using a catalyst through a chemical reaction or distillation known as "cracking," separating the crude oil product into gasolines, gases and heater oils suitable as marketable products. The products are combustible and in the refining process of this unit are subjected to tremendous pressures and very high temperatures running up to 1200 degrees.

12. The general responsibilities and duties of the employees on a "cat cracker" unit were described as:

"Well, each man had a lot of instruments to catch. Temperatures. Pressures. Levels. And, charts, and these instruments to read and record. Well, on these slide valves we had to watch those closely, and differential pressures. In other words, you constantly had to be watching your instruments and your controls. (Tr. 42)

"* * * and periodically have other duties to do, such as drawing water on things manually. They have to, on these instruments we have, to watch for high temperatures. If we get our temperature out of range possibly five degrees it can make quite a difference in the products." (Tr. 45)

Such an error could cost the company several hundred dollars a day. The unit operates continually twenty-four hours a day and is never stopped other than for repairs every two years.

"If we failed to do our work efficiently, it would affect the quality of the product. We could damage the equipment. In fact, like on our differential on the circulation of these hot catalyst; if we let the flow get going in the wrong direction, it would even blow it up. It is dangerous, even." (Tr. 46)

This finding of fact is based on the uncontroverted testimony of the witness Gibson, who on cross-examination and re-cross, testified as to various machinery changes, improvements and modernization, some of which decreased the duties, but more of which actually increased duties and responsibilities of an operating crew. Witness Basore testified that the added duties and responsibilities on the three-man crew were increased, that in some instances the three-man crew was unable to complete all the duties formerly performed by the four-man crew, and that the work became a "little more dangerous." (Tr. 94)

13. The evidence of the plaintiff before the Court, unrebutted and unsullied by cross-examination of defendant, showed that as a result of the crew size reduction from four employees to three on the fluid cracking unit on November 1, 1965, the work level of those previous four employees was substantially changed as to duties, place of employment, hazards of employment, while the compensation, seniority rights, and opportunity for regular employment of all employees were lessened.

14. By the acts of the defendant from 1957, both at the Whiting and Neodesha refineries, defendant has placed upon the contract language here its own construction in past grievances and disputes, which may be construed here as most significant admissions against defendant's interest, a ratification that crew size changes previously have been, in fact, a proper area for arbitration under the contract, and that the defendant company itself has the view of Section 2.11(3) that its purpose is to provide arbitration of matters to which the contract does not specifically in words refer, but which are encompassed in the past history of actions between the management plaintiff and union defendant. This finding is most graphically illustrated by a written statement in a Company brief filed in another grievance dispute at Neodesha shortly before the dispute at bar arose (Plaintiff's Exhibit 24), and to which brief and related testimony defendant vehemently objected (Tr. 172–191) as being admitted as evidentiary material here, viz.:

"Paragraph A3 of this section (referring to Article 2.11) tells us clearly that the parties were aware of the many subjects of mutual interest *which were not referred to or covered by the contract.* They were aware of the fact that the Company has the responsibility to operate the refinery and to make decisions concerning its operation. Thus it was foreseen that the Company might undertake the 'modification,' 'discontinuance,' or 'establishment' of past 'policies, practices, customs or usages relative to working conditions * * *' The Union insisted that there be some means for them to obtain redress in case the Company abused its expressed right to modify, discontinue or establish a practice relative to working conditions. The Company agreed to include a means of redress and Paragraph A3 is the result." (Plaintiff's Exhibit 24, p. 13.) (Emphasis supplied)

15. Some examples of what constituted past practices, as contemplated by this management and its labor organizations over the previous years, were: the size and composition of pipe gangs (Plaintiff's Exhibit 11); method of tank car loading and pumping department work (Plaintiff's Exhibit 12); determination of which job classification would make the necessary hooking and unhooking operations of a crane (Plaintiff's Exhibit 16); a recognition of crew size on link belt speeder crane while operated on public roads (Plaintiff's Exhibit 18); recognition of crew

size for a winch truck when the job was complex or potentially hazardous (Plaintiff's Exhibit 20).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this action.

2. The Plaintiff Union's grievance raises a question involving and arising from a change in the number or numbers of non-supervisory employees, i.e., the crew size, to be assigned per shift to the operation of the Company's fluid cracking unit at its Neodesha, Kansas, refinery.

3. The Defendant Company is not obligated to submit the Union's grievance to arbitration unless the Union's grievance is arbitrable pursuant to Section 2.11 of Article II of the contract.

4. The Union's grievance is not arbitrable pursuant to Section 2.11 of Article II of the contract unless it either (a) raises a question directly involving or arising from applications, interpretations or alleged violations of a provision of the contract, or (b) raises a question involving or arising from a modification or discontinuance of a past policy, practice, custom or usage, or involving or arising from the establishment of a new policy, practice, custom or usage, relating to or dealing with the operation of the refinery or the acts of the parties in relation thereto.

5. The Union's grievance does not raise a question directly involving or arising from the application, interpretation or alleged violation of any provision of the contract; no provision of the contract relates to or deals with the number or numbers of non-supervisory employees to be assigned per shift to the operation of the Company's fluid cracking unit at its Neodesha, Kansas, refinery.

6. The Union's grievance does raise a question involving or arising from a modification or discontinuance of a past policy, practice, custom or usage, or involving or arising from the establish-
ment of a new policy, practice, custom or usage between the Company and the Union within the express terms and intent of Section 2.11(A) (3) of Article II of the contract.

7. The Company is therefore obligated by the terms of the contract to submit the Union's grievance to arbitration.

## OPINION

The sole issue to be decided by this Court is whether or not the grievance asserted by the plaintiff is required to be arbitrated under the terms of the collective bargaining contract.

The Supreme Court, in the "Steelworkers trilogy" of cases, United Steelworkers of America v. American Manufacturing Company, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America, AFL–CIO v. Warrior & Gulf Navigation Company, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed. 2d 1409; and United Steelworkers of America v. Enterprise Wheel and Car Corporation, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424, has laid down the guidelines for the decision of the Court here. The Supreme Court has said that the arbitral process between management and labor for public policy reasons is a most desirable result, since it guarantees self-government between the parties in the settlement of disputes. These three cases laid down these now-accepted principles of law: (1) Parties to a contract may apply to a court for enforcement of its terms relating to arbitration; (2) arbitration will or will not be ordered, depending upon the terms of the contract relating to the scope of the arbitral promises; (3) if there is any ambiguity in language of the arbitral promise, for reasons of public policy, an order to arbitrate should not be denied unless the court can say with positive assurance that the contract could not in any way be interpreted so as to call for arbitration; and (4) the interpreting court should not be influenced by its own views as to the merits of the dispute, but confine itself strictly to a de-

termination of whether the contract requires arbitration of the particular dispute.

■ The Supreme Court has also made it crystal clear that, in deciding whether there is a promise to arbitrate a disputed area, the trial court must look at the language of the contract taken as a whole, and interpret it by the same means by which contracts generally are interpreted. Finally, as Justice Brennan said in United Steelworkers of America v. American Manufacturing Company, supra, this Court must give due consideration to the context in which the promise was made. The meaning and content of the promise is not to be found simply in the dictionary definitions of the words alone, but by reference to the background which gave rise to the inclusion of these words and their composite phraseology in the promise, including any interpretations placed on them previously by the parties.

■ As a preliminary to the substantive decision or dispositive action of this Court, it should be noted that the only evidence introduced at the trial was on behalf of the plaintiff. The defendant introduced no evidence at the trial and confined itself to exhibits in evidence and cross-examination of plaintiff's witnesses. Plaintiff's evidence was in two principal areas, viz., first, testimony on factual issues regarding past practices and their relationship to working conditions before and after the crew size change at the "cat cracker;" and, second, testimony and documentary evidence relating to past practices between management and the union on negotiations, agreements and arbitrations over changes in crew size and previous positions of the parties on interpretation of Section 2.11(A) (C) of the contract. In this situation, no area of credibility would exist—only the question of weight and relevancy to be considered by the trier of fact. Actually, as the Court sees the stance of this case, it must be viewed in the light of a presumed defendant's motion for summary judgment or motion for judgment at the close of plaintiff's evidence by defendant; that is, plaintiff is entitled to all favorable inferences that may be gleaned from the evidence.

■ It is the contention of plaintiff that the grievance in question is clearly the subject of arbitration under one of two, or both, sections of the contract. Plaintiff asserts that Section 2.11(A) (1) applies to this case in that the very existence of the grievance or dispute between the parties, and its rejection by the defendant on the ground of non-arbitrability, demonstrates the existence of a "question" involving the interpretation or possible violation of the terms of the contract. Therefore, according to plaintiff's contention, the grievance is clearly arbitrable under Section 2.11(A) (1). This Court is unable to discern merit in that contention.

It is noted that Section 2.11(A) (1) provides for arbitration of questions involving the *terms of the agreement*. Nowhere in the contract does a provision pertaining to crew size appear. Since there is no term in the contract relating to crew size, there is nothing which can be applied, interpreted, or allegedly violated. Further, the fact that the contract contains specific definitions of what type of questions are arbitrable (Section 2.11(A) (2) and (3)), and specific prohibitions of those not arbitrable (Section 2.11(b) and (C)), negative plaintiff's contentions as to the breadth and scope of Section 2.11(A) (1). Under plaintiff's theory, every dispute would have to be arbitrated. Such was not the intention of the parties.

It must necessarily follow, then, that there is no question to be arbitrated under Section 2.11(A) (1). See Independent Petroleum Workers of America, Inc. v. American Oil Company, 324 F.2d 903 (7 Cir. 1963), affirmed 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964), rehearing denied 379 U.S. 985, 85 S.Ct. 639, 13 L.Ed.2d 579 (1965); and Local Union No. 483, Int. Bro. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO v. Shell

Oil Company, 369 F.2d 526 (7 Cir. 1966).

Plaintiff's other principal contention is that the grievance under consideration is arbitrable under Section 2.11(A) (3) of the contract. Simply stated, that section provides for the arbitration of, among other things, a change in or a discontinuance of policies, practices, customs or usages relative to working conditions. These words, say the plaintiff, brought into the collective bargaining contract, by reference, the full number of policies, practices, customs or usages that existed at the time the contract was signed. Subsequently, and similarly, any other policies, etc. coming into existence later became integral parts of later contracts. In sum, Section 2.11(A) (3) incorporated by reference, as though set forth in full, all of those many practices in existence and to come into existence, by the acts of the parties throughout the history of the contract (Plaintiff's Brief, p. 15; and Reply Brief, p. 9). It is plaintiff's position that defendant's reduction of crew size on the fluid cracking unit changed a long-term practice that related to working conditions, and consequently a question was raised by the Union's grievance which requires arbitration under the collective bargaining agreement.

On the other hand, the defendant controverts this position by contending that arbitration is called for only as to matters of past policies, practices, customs or usages relative to "working conditions" which are the subject matter of promises *expressly* referred to in the contract, and that, significantly, the contract under interpretation contains no specific mention of crew size or the number of employees who will be assigned to any unit, operation or job, including the fluid cracking unit of the refinery (Defendant's Brief, p. 33). Defendant argues further that the language of the contract provisions 2.11(B) and (C) buttress and sustain its contention.

■ What is a past policy, practice, custom or usage relating to work-ing conditions? In substance, by the application of common sense without any judicial subtlety or refinement, these words simply mean the traditional or historical way of doing things. "Working conditions," a term somewhat peculiar and prevalent in the labor-management area, means the panoply of the incidents of the employment relationship.

■ Was the change in the crew size of the "cat cracker" a policy, etc., relating to "working conditions?" Within the evidence before the Court, as set forth in the Findings of Fact, the answer must emphatically be affirmative. The four-man crew size on the "cat cracker" had existed for at least twelve years. The reduction in crew had a proliferating result along refinery union employees generally, affecting job opportunity, job seniority, job promotion, and job compensation. In the process division, which included the cat cracker, it meant a change in place of employment, job duties for each man on the three-man crew on the cat cracker were increased, job responsibility for each man was increased, and job danger or hazardous condition of employment was increased. Aside from the evidence, as an abstract proposition, it is the opinion of the Court that the normal interpretation of 2.11(A) (3) would, as a matter of fact, necessarily include the factual situation we have here. It is obvious that the employment of a particular number of men on a particular unit to do regular and particular services is a practice relating to working conditions. Furthermore, it is equally obvious that after a long period of time, especially since 1953, a reduction of working force on a particular unit constitutes a change or modification of a past practice. The logical conclusion follows that the question raised by the plaintiff must be referred to arbitration under 2.11(A) (3) of the contract.

■ However, defendant contends that Section 2.11(B) of the contract makes it abundantly clear that the ques-

tion raised by the plaintiff is not arbitrable. With this, the Court cannot agree. That section is clearly secondary to the primary arbitration clause of 2.11(A). It provides that grievances relating to new classifications, rates of pay, hours of employment, and other conditions of employment not expressly provided for either in the contract, in side agreements, or by arbitration awards, shall be subject to bargaining, but that either party may refuse to arbitrate the grievance unless it is covered under Section 2.11(A) of the contract. Section 2.11(C) simply reserves the addition of new written provisions, change in the written provisions or termination of the agreement, to be matters for consideration of the contracting parties alone, without reference to the arbitral processes set forth in the contract. Since, as noted above, this Court is of the opinion that the grievance raised is clearly the subject of arbitration, pursuant to 2.11(A) (3), defendant's argument as to 2.11(B) or (C) is not cogent.

It occurs to the Court that there is another sound reason for sustaining plaintiff's position here that Section 2.11(A) (3) concerning a change in past practices, etc., relative to working conditions, such as the change in the crew size at the "cat cracker" here, are subjects of arbitration under the contract. As both parties recognize in their briefs, the problems and questions arising between management and labor in a large industrial operation such as a refinery, are so numerous and multifarious that no written contract could conceivably cover or contemplate most of them. Logic dictates that the intention of the parties was to negotiate and/or arbitrate on the smaller problems or questions such as the size of a crew necessary to perform a part or unit of the total plant operations, claimed injustices or inequities to individual employees, or some other grievance not involving the whole or a large number of union employees at a particular factory, and in recognition of the minimal nature of this type of dispute, labor would forego its right to strike and management its right to lockout. On the other hand, the total contract undertook to define areas of major disagreement involving *all* the union's membership working in all units of the industrial operation by spelling out job classifications, rates of pay, hours of employment, fringe benefits, etc. Section 2.11(B) and (C) confirm that these large areas of employer-employee coverage are not arbitrable and the right to strike, which usually affects the whole plant, is reserved and made available as the traditional, ultimate and last resort weapon of labor, which when used successfully or unsuccessfully, spells out tremendous economic loss to both labor and management, and usually the public.

Thus, from 1953 on, arbitration was limited to questions of applications, interpretations, or alleged violations of the agreement, similar questions relating to side agreements or arbitration awards, and to one other significant area. This was the area of those hundreds of past practices, such as who might perform a task, or with whom, or when, or where —practices so very numerous that not even resourceful unions and employers could list them all in the stress of contract negotiations. As subsequent contracts were negotiated, identical incorporation by reference to old policies, practices, customs and usages, without specific designation, was made within the scope of the context and meaning of Section 2.11(A) (3).

One other point should be touched on. To sustain its position regarding Section 2.11(A) (3) of the contract, defendant cites and strongly relies on the case of Independent Petroleum Workers of America, Inc. v. Standard Oil Company, 275 F.2d 706 (7 Cir. 1960). There the Court held that the language of the contract, which is the same language as is contained in the contract before the Court in the case at bar, "relating to past policies, practices, customs or usages relative to working conditions was not intended to and does not include within its scope the subject of contracting out work * * * to independent

contractors," and cited as authority the case of United Steelworkers of America, AFL–CIO v. Warrior & Gulf Navigation Company, 269 F.2d 633 (5 Cir. 1959). Nonetheless, and despite the similarity of issue and identical contract language between the instant case and the Independent Petroleum Workers of America, Inc. v. Standard Oil Company, supra, case, this Court is not convinced of the soundness of that decision, particularly since the authority which was relied upon was subsequently reversed by the United States Supreme Court in the trilogy case of United Steelworkers of America, AFL–CIO v. Warrior & Gulf Navigation Co., supra. It was in that case that the United States Supreme Court emphatically said:

> "An order to arbitrate the particular grievances should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

Further, the validity of that Seventh Circuit holding has been virtually eroded by all of the United States Supreme Court cases since, dealing with the subject of arbitration, and by numerous well-written decisions in other circuits including, but not limited to: Desert Coca Cola Bottling Co. v. General Sales Drivers, Etc., Local 14, 335 F.2d 198 (9 Cir. 1964); Camden Industries Co. v. Carpenters Local Union No. 1688, 353 F.2d 178 (1 Cir. 1965); and Carey v. General Electric Company, 315 F.2d 499 (2 Cir. 1963).

The history of the parties' own interpretations of the provisions of this agreement would seem to fully confirm the decision of the Court concerning the applicability of 2.11(A) (3) to the grievance herein. It has been said:

> "The very nature of a collective bargaining agreement requires that it be read in the light of bargaining history and the history of the parties' own interpretations.

> "A new technical rule of evidence which would render incompetent parol evidence of a party's intent, would seem pecularily inappropriate in the area of collective bargaining.

> "What the court has said, as we quoted in our earlier opinion at [United States v. Garguilo, 2 Cir.] 310 F.2d 249, is that: 'In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail * * * United Steelworkers [of America, AFL–CIO] v. Warrior & Gulf Nav. Co., 363 U.S. 574, at 584, 585, 80 S.Ct. 1347, at 1354.' But this recognizes that if evidence of intent is of the 'most forceful' character, it need not be confined to the language of the contract * * * The Court, then, has not announced a rule of evidence; it has simply warned that the persuasive power of the evidence must be such that the truth emerges with forceful clarity."

See Communications Workers of America v. Pacific Northwest Bell Telephone Co., 337 F.2d 455 (9 Cir. 1964), which cites as authority for the quotation the trilogy case of United Steelworkers of America v. American Manufacturing Co., supra; and Drake Bakeries, Inc. v. Local 50, Am. Bakery and Confectionery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474.

The previous actions of the parties here, that is, the defendant company and the brother local of plaintiff union at the Whiting refinery, and plaintiff union and defendant company at the Neodesha refinery, indicate an interpretation of the contract by the parties to include questions such as the grievance which precipitated this litigation as being within the area of arbitrability. (See Court's Finding of Fact No. 14.) The most significant recognition by the company at a time just prior to the inception of this litigation concerning its interpretation of the nature, extent and

purpose of 2.11(A) (3), as shown in its own company brief, is found also in the Court's Finding of Fact No. 14. While the company plainly states in its brief that the reason it arbitrated in these instances was that it *wanted* to arbitrate, rather than being *compelled* by contractual provisions to arbitrate, such a contention is possible under the evidence, but very peculiar and illogical as a rule of conduct, in this Court's opinion. Therefore, although the Court believes the contract to be unambiguous concerning the arbitrability of the present grievance, it finds its opinion confirmed by the evidence admitted and uncontroverted by the defendant as to previous arbitration of past practices similar to the grievance before the Court here.

Upon the state of the evidence presented, the consideration and interpretation of the bargaining agreement from its four corners, and the best legal reasoning presented in the oral arguments and well-written briefs by the competent counsel of both parties, this Court holds the contract to be clear and unambiguous. The Court believes it can be said with positive assurance that the arbitration clause encompasses the grievance posed by plaintiff union. To the contrary, the least that could be said is that the verbiage of Section 2.11 has grey areas in that no specific exclusion of arbitrability of grievances like the one at bar is spelled out in the contract, so that under the precept of the trilogy case of United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, the result for the plaintiff's position would be the same. Therefore, the grievance before the Court is one which must be arbitrated. The defendant company must perform those acts which it promised to perform. See Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

Accordingly, judgment is hereby decreed and entered for the plaintiff and against the defendant, requiring the grievance be submitted by the parties for arbitration. The Clerk is directed to enter this judgment forthwith, including the taxing of costs to defendant.