UNITED TRANSPORTATION UNION,
LOCAL LODGE NO. 31, Appellant,

v.

ST. PAUL UNION DEPOT COMPANY,
Appellee.

No. 20285.

United States Court of Appeals,
Eighth Circuit.

Nov. 13, 1970.

Patrick J. Foley, Minneapolis, Minn., for appellant.

Gordon Forbes, St. Paul, Minn., for appellee.

Before GIBSON and LAY, Circuit Judges, and HUNTER, District Judge.

LAY, Circuit Judge.

This is an appeal filed by United Transportation Union, Local Lodge No. 31 (hereinafter U.T.U.) from the district court's denial of injunctive relief sought to prohibit the St. Paul Union Depot Company from abolishing certain job assignments during the pendency of a notice served under the Railway Labor Act (45 U.S.C.A. § 151 et seq.) to negotiate the disagreement. The Depot Co. owns and operates railroad yard and terminal facilities at St. Paul, Minnesota. On January 9, 1970, the U.T.U. served on the company a notice under § 6 of the Act to negotiate:

"[O]ur desire to change, modify or supplement existing agreement or agreements, to become effective 30 days from the date of this notice, to provide that the St. Paul Union Depot Company will not abolish, annul or cancel any assignments or jobs without negotiation or agreement with the General Committee of Adjustment, United Transportation Union." [1]

The parties thereafter conferred without reaching agreement. On March 30, 1970, the U.T.U. requested the services of the National Mediation Board under the Railway Labor Act. On April 9, 1970, the company announced that three switchtender assignments at Shanty No. 10 would be abolished the following day. The union immediately sought injunctive relief on the ground that the company had failed to maintain the status quo while the dispute was under the jurisdiction of the Mediation Board. The district court denied relief on the ground that the parties had observed in the past an established practice which allowed the company to unilaterally abolish work assignments. The district court considered this practice to be part of the status quo. We affirm.

The Supreme Court discussed the status quo provisions of the Railway Labor Act in Detroit & Toledo Shore Line R. R. v. United Transp. Union, 396 U.S. 142, 150–151, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969):

"There are three status quo provisions in the Act, each covering a different stage of the major dispute settlement procedures. Section 6, the section of immediate concern in this case, provides that 'rates of pay, rules, or working conditions shall not be altered' during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board. Section 5 First, provides that for 30 days following the closing of Mediation Board proceedings 'no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose,' unless the parties agree to arbitration or a Presidential Emergency Board is created during the 30 days. Finally, § 10 provides that after the creation of an Emergency Board and for 30 days after the Board has

[1]. On January 19, 1970, the company in turn served a notice to negotiate on:
"[A]ll agreements, rules, regulations, interpretations and practices which lim-

it the right of the carrier to establish and abolish yard service and yard service assignments shall be eliminated."
This notice is still pending.

made its report to the President, 'no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose.' These provisions must be read in conjunction with the implicit status quo requirement in the obligation imposed upon both parties by § 2 First, 'to exert every reasonable effort' to settle disputes without interruption to interstate commerce."

The Court observed that although §§ 5, 6 and 10 are not identical, the sections nevertheless are to be construed together with § 2 First as providing an "integrated, harmonious scheme * * * [and] * * * the intent and effect of each is identical so far as defining and preserving the status quo. * * *" *Id.* at 152, 90 S.Ct. at 300.[2]

In the instant case, the company asserts that there was an "established practice" arising from conduct over a period of eight years whereby job assignments had been unilaterally discontinued without U.T.U. objection. It contends that this practice was part of the status quo frozen upon service of the § 6 notice. The union contends that the practice was not a "working condition" and therefore was not part of the status quo. The union asserts that only the job assignments themselves were part of the status quo and unilaterally abolishing them is in clear violation of the Railway Labor Act. In the *Shore Line* case the Supreme Court stated the railroad would not be barred from ordering job assignments if they "had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions." *Id.* at 154, 90 S.Ct. at 301. The U.T.U. contends this refers only to the making of the actual assignments in dispute rather than reference to an over-all practice or right to make the assignments.

We would agree that the prior occurrences of similar conduct should not be considered a *per se* "practice" or "working condition" under the Railway Labor Act. We think that an "established practice" under the Act was intended to include only prior conduct of the parties which has attained the dignity of a relationship understood by the parties to at least impliedly serve as if part of the collective bargaining agreement. Although not dealing with the Railway Labor Act, the Supreme Court in discussing "practices" of an industry under collective bargaining agreements observed in United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1343, 4 L.Ed. 2d 1403 (1960):

"The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." 363 U.S. at 581–582, 80 S.Ct. at 1352.

An "established practice" under the Act should demonstrate not only a pattern of conduct but also some kind of mutual understanding, either expressed or implied. Thus, prior behavior by itself, although similar to the acts in dispute, falls short of an "established practice."

2. Mr. Justice Black in discussing the "status quo" requirement commented:

"The Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce." Id. at 150, 90 S.Ct. at 299.

Whether prior conduct establishes a working practice under the Act depends upon consideration of the facts and circumstances of the particular case. Among the factors one might reasonably consider would be the mutual intent of the parties, their knowledge of and acquiescence in the prior acts, along with evidence of whether there was joint participation in the prior course of conduct, all to be weighed with the facts and circumstances in the perspective of the present dispute. Compare Pekar v. Local 181, Brewery Workers, 311 F.2d 628 (6 Cir. 1962), cert. denied 373 U.S. 912, 83 S.Ct. 1303, 10 L.Ed.2d 414 (1963); Independent Petroleum Workers of America, Inc. v. Standard Oil Co., 275 F.2d 706 (7 Cir. 1960); Independent Oil Workers Union, Local 117 v. American Oil Co., 296 F.Supp. 650, 658 (D.Kansas 1969); Guenther v. Morehead, 272 F.Supp. 721, 726–728 (S.D.Iowa 1967); McClure v. E. A. Blackshere Co., 231 F.Supp. 678, 682 (D.Md.1964); Whitam v. Chicago, R. I. & P. Ry., 66 F.Supp. 1014, 1017 (N.D.Texas 1946). See also Treece, Past Practice and Its Relationship to Specific Contract Language in the Arbitration of Grievance Disputes, 40 Colo.L. Rev. 358 (1968).

■ In the present case the district court was not faced with the necessity of an evidentiary hearing to determine if the prior unilateral abolishments constituted an accepted practice within the Act.[3] The U.T.U. stipulated at the hearing before the district court:

"That there has been, over a long period of time, an established practice on the defendant's property under which job assignments have been discontinued and that such practice was known to and acquiesced in and not objected to by the employees or their organization."

We think this stipulation forecloses consideration of the issue raised by the union on appeal.

■ The union additionally contends that the company may establish a practice to make work assignments but not the right to abolish assignments. We fail to see the distinction. The terms "working condition" and "practice" under the Act are to be broadly interpreted. 396 U.S. at 153, 90 S.Ct. 294. See also Manning v. American Airlines, Inc., 329 F.2d 32, 35 (2 Cir. 1964) and National Airlines, Inc. v. International Ass'n of Machinists and Aerospace Workers, 303 F.Supp. 1132, 1133 (S.D. Fla.1969). It cannot be doubted that the company could be given the express right to unilaterally abolish work assignments within the terms of the collective bargaining agreement. If this right existed as part of the agreement, upon a § 6 notice to change the agreement, it would unquestionably be part of the status quo. Any attempted change of the right through negotiation would be subject to the status quo provisions of the Act until actually changed. The fact that the right is established as an accepted "practice," rather than by express agreement, cannot change what is to be frozen as part of the status quo. 396 U.S. at 153–155, 90 S.Ct. 294.

Judgment affirmed.

3. It was undisputed that the company had previously discontinued the following switchtender assignments:

1. July 1, 1962, Shanty 4 (3:00 p. m. to 11:00 p. m.)

2. May 1, 1964, Shanty 5 (11:59 p. m. to 7:59 a. m.)

3. August 29, 1967, Shanty 8 (6:30 a. m. to 2:30 p. m.; 3:59 p. m. to 11:59 p. m.; 11:59 p. m. to 7:59 a. m.)

4. April 25, 1969 Shanty 6 (7:00 p. m. to 3:00 p. m.)

5. April 20, 1969, Shanty 2 (4:00 p. m. to 12 midnight).