**UNITED TRANSPORTATION UNION, a voluntary unincorporated association, Plaintiff,**

v.

**MANUFACTURERS RAILWAY COMPANY, a Corporation, Defendant.**

**No. 71 C 356(2).**

United States District Court, E. D. Missouri, E. D.

Jan. 13, 1972.

John H. Haley, Jr., and David J. Fingerhut, Associate Counsel, St. Louis, Mo., for plaintiff.

Albert E. Schoenbeck, St. Louis, Mo., for defendant.

## MEMORANDUM AND ORDER

REGAN, District Judge.

This action was brought to require defendant to restore and maintain the status quo and the working conditions of its employees which were allegedly in effect prior to March 12, 1971, pending exhaustion of the procedures of the Railway Labor Act for changing the Collective Agreement between the parties and the working conditions of defendant's employees. Incident to such relief, plaintiff also seeks a declaratory judgment with respect to whether certain notices served by the parties are Section 6 notices and whether certain alleged changes in working conditions constitute a violation of the Act.

Both parties have moved for summary judgment on the ground there is no genuine issue as to the material facts. The basic disputed issue of law is whether under the facts defendant made a change in the status quo.

Defendant is engaged in interstate commerce in the states of Missouri and Illinois as a common carrier by rail. Plaintiff is an unincorporated labor organization, the successor of the Brotherhood of Locomotive Firemen and Enginemen, as the representative under the Railway Labor Act of employees of defendant in the crafts of locomotive engineer, fireman and hostler, collectively referred to as enginemen. We will use the term "union" in referring to both plaintiff and its predecessor.

Under the Collective Agreement between defendant and the union, revised effective November 15, 1954, defendant was required to employ firemen on every diesel engine operated by it. Prior to the Award of Arbitration Board No. 282, defendant employed more than the number of firemen required to fill vacancies permanently and temporarily occurring in positions of locomotive engineer, fireman and hostler. These surplus employees were known as "extras"

and were carried in seniority order on a so-called "extra board" and were assigned by defendant on a rotating basis to work permanently or temporarily as locomotive engineers, firemen or hostlers. The Collective Agreement covers the rates of pay, hours, and working conditions of enginemen. It also provides for a fireman's "extra board" and for filling vacancies by calling men from the "extra board."

Under the provisions of the Award of Arbitration Board No. 282, defendant was authorized to reduce the number of persons required to be employed as firemen, subject to further requirement that defendant continue to provide employment for firemen having certain specified qualifications. These firemen positions which defendant was required to continue became known as "non-blankable" positions, and those which the Award authorized discontinued became known as "blankable" positions. The employees remaining in service pursuant to the provisions of the Award were considered as "retained" or "protected" men. At times when regular jobs as enginemen were not available to such "protected" men they were allowed to work on "blankable" positions, thereby giving them the protection required under the Award. Other firemen were separated from defendant's service. The effect was to permit the "extra board" to become exhausted and dormant, there being sufficient "protected" men on "blankable" positions to fill vacancies, a procedure which the union did not question.

Thereafter, in June, 1965, when defendant had need for additional extra enginemen, it determined, with the consent of the union, to employ two new men as "blankable" firemen in lieu of exercising its right to reactivate the "extra board" at that time. The men so employed were assigned from time to time to fill vacancies temporarily or permanently occurring in enginemen positions, along with three enginemen in service as "protected" men who were then on "blankable" firemen jobs. The

five men were divided among the three 8-hour shifts to be available for the greatest part of the time, working "blankable" jobs only when there were no other jobs available.

The understanding between the parties with respect to the foregoing was confirmed by a letter dated June 10, 1965, written by defendant's vice-president and agreed to by the union's general chairman. This letter, in pertinent part, reads as follows:

"This will confirm the meeting you had with Messrs. Sargent and Schicker and me in my office on June 7, 1965, when we discussed the need for additional men in our engine service. As was explained to you, we have four men who are over 65 years of age, and, of course, one or more of them may retire in the near future. In addition, we have had to increase the number of yard crews. As a result, the number of men on blankable jobs have been reduced to three. We have used these men to fill any non-blankable vacancies in the absence of an extra board which was eliminated when firemen were separated from the service as provided in the Award of Arbitration Board No. 282.

In our discussion we decided that it would be more advantageous to assign the new men to blankable jobs rather than to re-establish an extra board. The need is for two additional men which, added to the three men now on blankable jobs, will give us five men to fill non-blankable vacancies. In order to fill the vacancies with the least trouble, it was understood that one man would be assigned to the first shift and two men on each of the second and third shifts.

A hostler or non-blankable fireman vacancy will be filled by using one of the aforementioned blankable assignment men on the shift on which the vacancy occurs. This will avoid using a man from another shift which creates inconveniences and possible loss of time. In the event there is no one on that shift to fill a vacancy, and a man has to be moved from another shift, the youngest such man will be used.

This arrangement will not supersede the rights of promoted men to fill engineer vacancies in conformity with existing rules. When a vacancy is filled by a fireman from a blankable job, such blankable job will not be filled.

It was pointed out that it was likely that two of the oldest men now working as hostlers may want to work as firemen and that the newly employed men would then become hostlers. This brought up the problem involved with the second shift hostler who is responsible for calling enginemen for vacancies. A new man would not be qualified for this. Mr. Sargent has studied this matter and has found that a change in off days of the hostler assignments will take care of this problem.

It is understood that the newly hired men acquire no guarantee and that the company has the right to furlough them should there be a reduction in the number of engine assignments. We do not anticipate that they will be furloughed, because of circumstances in the picture, but the record should show that we would have the right, under the agreement, to do so. This, of course, does not apply to retained men under the terms of the Award.

It is further understood that should there be a change in conditions, either party may serve a notice on the other for reestablishment of the extra board, giving at least thirty (30) days' advance notice. It is agreed that in the event this occurs, the parties will arrange to make themselves available for immediate conferences, so that the terms and conditions for the re-establishment of the extra board can be determined and the matter agreed upon as early as possible. In the event no agreement can be reached, the extra board, being re-es-

tablished, will be subject to the applicable rules of the working agreement. This is subject, of course, to the provisions of applicable National agreements."

By October, 1970, there were regular full time jobs available for all "protected" enginemen, so that defendant deemed it no longer necessary to continue the "blankable" firemen jobs. In January, 1971, there were seventeen protected enginemen in active service and five who were hired after June 10, 1965 and were unprotected under the Award. The railroad then had seventeen regular full time jobs available as enginemen.

In the latter part of January, 1971, defendant determined to restore the dormant "extra board" and so informed the union. By letter dated January 30, 1971, the defendant gave formal notice to the union of its purpose to restore the extra board which was provided for in the current collective bargaining agreement, the restoration to be effective March 1, 1971. The effective date was thereafter changed to March 15, 1971 at the request of the union.

In the interim, on February 11, 1971, the union served on defendant a formal Section 6 notice, expressly stated to be "(i)n accordance with the provisions of the Railway Labor Act, as amended," of its "desire to add to, eliminate, amend, modify or otherwise change existing agreements." One of the union's proposed changes was to the following effect: "In the event the Fireman-helper's extra board is re-established all fireman-helpers on said extra board shall be guaranteed eleven (11) straight time starts each half month. Starts paid at the time and one half rate under applicable agreements shall be in addition to the eleven (11) straight time starts." This notice also acknowledged receipt of defendant's January 30, 1971 letter which the union designated therein as a "*request* that the Fireman-helper's extra board be re-established effective 1 March, 1971."

The union's Section 6 notice was received by defendant on February 16, 1971 and was acknowledged February 22, 1971, by letter setting the date of February 26, 1971 for an initial conference. On February 24, 1971, defendant served counter-proposals for changes in existing agreements for concurrent handling with the union's February 11, 1971 notice. The initial conference with the union on the February 11th notice and the defendant's counter-proposals for changes in existing agreements was held on February 26, 1971, within the 30-day period required by the Railway Labor Act. The conference was recessed at the request of the union to be resumed on call by the union's general chairman. On that same date the union sought to invoke the services of the National Mediation Board. In its communications with the Board the union referred to defendant's letter of January 30, 1971 as a "Section 6 notice."

On March 12, 1971, defendant posted notice of the abolition of "blankable" jobs and the restoration of the firemen's extra board effective March 15, 1971. In view of the position the union was then taking, contrary to the company's contention that it had the right under the existing agreements to reactivate the extra board, defendant, on March 18, 1971, submitted to the National Railroad Adjustment Board, as a dispute over existing agreements, the "(r)ight of the carrier to restore the firemen's extra board in accordance with Agreement rules and letter agreement of June 10, 1965."

■ It is the position of the union that the January 30, 1971 letter of defendant is a Section 6 notice of defendant's intention to change the collective agreement and the working conditions thereunder, thereby commencing a "major dispute" with respect to the working conditions of defendant's fireman employees, so that defendant should be required to restore and maintain the "status quo" pending exhaustion of the requirements of the Railway Labor Act

for changing collective agreements and working conditions. Defendant on the other hand argues that the January 30 letter was neither intended nor considered by the union at the time to be a Section 6 notice and that the reactivation of the extra board did not constitute a change in the "status quo." We agree.

We start with the premise, which the union does not seriously question, that under the collective agreement of November 15, 1954 as amended, defendant had the contractual right, if not the obligation, to establish and maintain the fireman's "extra board." As appears supra, the result of the implementation of the Award in 1964 was to leave the "extra board" in a state of dormancy. From that time on until the reactivation of the extra board, defendant used firemen employed on "blankable" positions to fill any vacancies on regular jobs.

There is no basis whatever for the union's contention that the adoption of this procedure, for the convenience of both parties at a time when the utilization of the extra board would have served no mutually useful purpose, was intended to terminate the right of defendant to reactivate the extra board. The June 10, 1965 letter clearly recognizes such right on the part of both the carrier and the union. Nothing in that letter of understanding even implies that defendant was giving up or abandoning its *right* to establish the extra board or that it had theretofore done so. The only modification of the right to re-establish the extra board was the requirement in the letter that 30 days advance notice be given before the right was to be exercised and that during such 30-day period the parties attempt to reach agreement as to terms and conditions as to the re-establishment of the board, with the express proviso that if no such agreement was reached, the reactivated board would be subject to the applicable terms of the collective agreement. It is thus obvious that what was to be discussed during the 30-day period was not whether or not the board could or should be

re-established (the right to do so being unquestioned) but only the terms and conditions thereof. It is further obvious from the letter that even a failure to agree on such terms would not prevent the re-establishment of the board.

The January 30, 1971 letter must therefore be read in the light of the contractual rights of defendant under the collective agreement and the letter of June 10, 1965. So read there is no doubt in our mind that the letter was neither intended to be nor could reasonably have been considered to be a Section 6 notice for the purpose of making changes in the working conditions or established practices of the parties. That the letter was a "notice" is, of course, evident on its face. However, the "notice" was given not because of any requirement of the Act, but solely for the purpose of complying with the understanding contained in the letter agreement of June 10, 1965. We quote:

"It would be our purpose to restore the Board immediately, but you insisted that you would object unless 30 days' advance notice was given. Accordingly, and although I do not agree that we could not restore it earlier, we will do so effective March 1, 1971. Apparently you rest your objection on the contents of a letter agreement dated June 10, 1965. In that letter it was agreed that when the 30 days' advance notice was given, and this letter is such notice, the parties would make themselves available for immediate conferences so that the terms and conditions for restoring the Extra Board could be determined as early as possible. I shall, therefore, expect to hear from you promptly as to when we might meet for this purpose."

In our view the first Section 6 notice was that given by the union under date of February 11, 1971. Therein the union gave "formal notice of our desire to add to, eliminate, amend, modify or otherwise change existing agreements," to the effect that "(i)n the event the fireman-helper's extra board is re-estab-

lished all firemen-helpers on said extra board shall be guaranteed" etc.

There is no dispute between the parties respecting the obligation of defendant to maintain the status quo. The issue here is simply whether the re-establishment of the extra board constituted a change in the status quo. Plaintiff relies upon the decision of the Supreme Court in Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325. In that case the collective agreement contained no provision which would prohibit the railroad from making outlying work assignments. Relying on this fact the railroad notified the union of its intention to establish such outlying work assignments at Trenton, Michigan, the effect of which would have required many employees to report for work at a place other than where they had been reporting. The union then filed a Section 6 notice proposing an amendment to the collective agreement respecting the changed working conditions of the employees who had worked out of Trenton, thereby invoking the "major dispute" procedures of the Act. While National Mediation Board proceedings were pending, the railroad announced the creation of the disputed work assignments and the union threatened to strike. The railroad sued to enjoin the strike and the union counterclaimed for an injunction prohibiting the establishment of the outlying assignments.

The question for determination in *Shore Line* was whether the status quo provisions apply only to matters which are explicitly covered in the existing collective agreement or whether they also apply for the purpose of preserving the actual, objective working conditions and practices out of which the dispute arose, even though the matter was "a previously uncovered condition." The Supreme Court adopted the latter construction as necessary to fulfill the purpose of the Act, taking note of the fact that actual working conditions which are satisfactorily tolerable to both sides are often omitted from the agreement. In situations of that kind the actual, objective working conditions have attained "the dignity of a relationship understood by the parties to at least impliedly serve as if part of the collective bargaining agreement." United Transportation Union, Local Lodge No. 31 v. St. Paul Union Depot Co, 8 Cir., 434 F.2d 220, 222.

The thrust of the union's argument in this case is that the actual working conditions as of the time the dispute arose had not included an extra board for a period of some years following the Award, so that the "status quo" necessarily precluded the reactivation of the board. We do not agree. An instructive case is United Transportation Union, Local Lodge No. 31 v. St. Paul Union Depot Co., supra. There, the Court held that "(w)hether prior conduct establishes a working practice under the Act depends upon consideration of the facts and circumstances of the particular case" and that "(a)n established practice under the Act should demonstrate not only a pattern of conduct but *also some kind of mutual understanding, either expressed or implied.*"

The facts here involved completely negate any understanding to the effect that the extra board was to be permanently eliminated and in effect deleted from the collective agreement. On the contrary, the June 10, 1965 letter of understanding, written just one year after the Award, convincingly demonstrates the defendant's *right* to establish and maintain the extra board was to continue as a viable part of the collective agreement. And, as held in the *St. Paul Union Depot* case, "(i)f this right existed as a part of the agreement, * * * it would unquestionably be part of the status quo."

In our opinion, *Shore Line* is clearly distinguishable both as to the rationale of the decision and as to the facts giving rise to the controversy. In *Shore Line,* the union was seeking by its Section 6 notice to prohibit by agreement the very change in working conditions (not covered by the collective agree-

ment) which the railroad was unilaterally attempting to make. That was a "major" dispute. Here, the parties have *already negotiated* the right of defendant to establish and maintain the extra board, and that right is expressly *covered* in the existing formal collective agreement as well as being expressly recognized as existent in the June 10, 1965 letter of understanding. The present controversy over the exercise of that right pertains to the interpretation and application of the agreement, and constitutes a "minor" dispute. Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886. And cf. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Airline Division v. Braniff International Airways, Inc., 5 Cir., 437 F.2d 1272.

The only "major" dispute in this case relates not to the defendant's January 30, 1971 letter, but to the Section 6 notice to change and amend the existing agreement pertaining to the extra board and the railroad's February 24, 1971 Section 6 counter-proposals. In this situation, the status quo to be preserved is the railroad's existing right to establish the extra board. It is the union, not defendant, which seeks to change the status quo.

We hold that since defendant had and has the contractual right under the collective agreement to re-establish the fireman's extra board, and that such right constitutes part of the status quo, any interpretation of that right involves a "minor dispute" which is not for resolution by the Court. We further hold that plaintiff has not demonstrated that it will suffer irreparable injury unless we enjoin defendant from exercising its right to re-activate the extra board. The record before us discloses that no problem has arisen by reason of the re-establishment of the board. To the extent that the matter is within our discretion, we decline to exercise such discretion in favor of plaintiff in this instance.

Accordingly, it is hereby ordered that defendant's motion for summary judgment should be and it is hereby sustained and plaintiff's cross-motion for summary judgment should be and it is hereby denied, and the Clerk is ordered to enter judgment in favor of defendant and against plaintiff in accordance herewith.