The **BORDEN COMPANY**, Appellant,

v.

**CLEARFIELD CHEESE CO., Inc.,**
a Pennsylvania Corporation.

No. 15614.

United States Court of Appeals
Third Circuit.

Argued March 29, 1966.

Decided Dec. 9, 1966.

Stanton T. Lawrence, Jr., Pennie, Ed-
monds, Morton, Taylor & Adams, Charles

E. McKenney, New York City, for appellant (G. Donald Gerlach, Pittsburgh, Pa., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief).

Frank L. Seamans, Karl B. Lutz, Pittsburgh, Pa. (Carl F. Barger, Edwin L. Klett, Eckert, Seamans & Cherin, Pittsburgh, Pa., on the brief), for appellee, William U. Smith, Smith, Smith & Work, Clearfield, Pa., Brown, Critchlow, Flick & Peckham, Pittsburgh, Pa., of counsel.

Before STALEY, Chief Judge, GANEY, Circuit Judge, and SHERIDAN, District Judge.

## OPINION OF THE COURT

GANEY, Circuit Judge.

This is an appeal from the lower court's granting of the defendant's motion for summary judgment.

The plaintiff filed suit for patent infringement against the defendant by complaint dated May 22, 1964, alleging that the defendant had infringed the Brandenberger patent, a Swiss patent which had not been used theretofore at any time, anywhere in the world, since its issuance on April 25, 1950, which it had acquired on May 19, 1964, just three days previously.

The plaintiff, Borden Company, is a New Jersey corporation having its principal place of business in New York City, New York, and the defendant, Clearfield Cheese Company, is a Pennsylvania corporation having its principal place of business at Curwensville, Pennsylvania, and is the second largest processor of cheese and cheese products, maintaining plants in Utah, Wisconsin and Missouri.

A brief history of the case shows that sometime in the mid-50's, the defendant was manufacturing individually packaged cheese slices under a process which was created and developed by one of its employees, Arnold N. Nawrocki. A patent was secured by the defendant on August 25, 1956, known as the Nawrocki patent, No. 2,759,308, for "Apparatus For Producing Individually Wrapped Cheese Slabs". These Nawrocki individually packaged slices proved not to be commercially satisfactory, as did several other individually packaged slices of cheese being sold throughout the United States and Canada. It was at this time that the defendant became aware of the Brandenberger patent, as it cited it as a reference in its application. What is sought to be enjoined here is not the Nawrocki patent, but a secret process unpatented, one known only to a few employees of the defendant-company working in an isolated building to which access is extremely limited, to such a degree that even top executives are not permitted to enter. The defendant-company, in the development of this secret process over a period of about three years, spent approximately $154,000. The market for the individually wrapped cheese slices began building up to a large degree because of the great demand on the part of housewives for the product since theretofore wrapped cheese had only been marketed in slices of eight or ten, or in half-pound packages. An indication of this is that from October 1, 1963, to September 30, 1964, the defendant and its subsidiaries sold over 29,000,000 pounds of individually wrapped slices of cheese for a sum in excess of $13,000,000.

Sometime in the mid-50's, the defendant-company contacted the plaintiff-company to determine whether the plaintiff-company would be interested in their (defendant's) making up for the plaintiff individually sliced cheese packages under the plaintiff's (Borden's) label, and the plaintiff, Borden, advised defendant, Clearfield Cheese, it was not interested. There was no question about the cheese itself to be used in the process, whether it would be the plaintiff's or the defendant's, as the plaintiff was only concerned with the process of individually wrapped cheese slices for sale. A conference, initiated by the plaintiff, Borden, on October 25, 1963, sought the defendant's help in packaging wrapped cheese slices under the Borden name. The defendant, Clearfield, wrote a letter to the plaintiff on December 4, 1963, advising it of the difficulties which might ensue from supplying the plaintiff with individually

wrapped slices of cheese. The first difficulty stated was that it had not been able to keep up with its own current demand and, additionally, that it was investigating some legal problems which might be encountered under the Robinson-Patman Act. Upon receipt of this letter, plaintiff made a notation on it as follows: "12/12/63—Do not be in a hurry to answer.", as well as another notation, "1–27–64 Hold till patents are cleared up."

As has been indicated, suit was filed on May 22, 1964, by the plaintiff against the defendant, three days after plaintiff's acquisition of the Brandenberger patent. As adverted to, the complaint alleged the defendant's process had infringed the plaintiff's patent and prayed for a final injunction against further infringement by the defendant, as well as an accounting for damages adequate to compensate for the infringement.

The defendant filed an answer denying infringement and alleged a counterclaim asking for a declaratory judgment holding the patent invalid under 35 U.S.C. § 103, and alleging that the subject matter thereof was obvious to a person having ordinary skill in the art and citing a number of earlier patents performing the same function as that of the patent in suit. Interrogatories were posed by the defendant to the plaintiff requesting an outline in detail of the steps of the process used by the defendant which infringed plaintiff's patent. Arthur B. Erekson, Vice-President of the Borden Company, answered describing the process on the basis of his knowledge which was gleaned only from that which was visible in examining the cellophane package of the defendant, having never seen nor heard described the defendant's secret process, since the defendant refused to disclose the same. To the same effect was his deposition, as well as other officers of the plaintiff-corporation who had been deposed. When plaintiff noticed the defendant's officers for the taking of depositions, defendant filed a motion for a protective order with respect to their secret process and before this came on for hearing, the defendant also filed a motion for summary judgment. However, previous to the filing of the motion for summary judgment, the defendant had filed affidavits for the President of its company, as well as one by Karl B. Lutz, a patent lawyer and member of a Pittsburgh law firm, which stated in paragraph 5 thereof, "I am confident that if it becomes necessary to try this case on the merits, it will be determined that defendant's 'secret process' does not infringe the Brandenberger patent on which plaintiff relies; * * *"

At the hearing on the "Motions for the Protective Order and for Summary Judgment", which was the label thereon, at the close thereof the defendant offered the pleadings, interrogatories and depositions it had taken and the plaintiff, likewise, offered its pleadings, the patent in suit, its file history and the prior art patents cited by the Patent Office. At argument and in their briefs, defendant contended, one, that, due to a long relationship between these parties about this very process, including correspondence between them which the defendant contended had not become conclusive prior to the time the plaintiff found this Swiss patent which it was presently using, should estop them since this conduct invoked the equitable doctrine of estoppel, as the facts on the record in the deposition stated, and, accordingly, the plaintiff should be barred from proceeding with this suit. The second ground urged in the motion for summary judgment is that when the plaintiff filed this suit it had no probable cause to think the defendant was violating the patent, since Mr. Erekson, Vice-President of Borden Company, knew, as early as 1956, that Clearfield was making individually wrapped slices of cheese and that the bringing of suit three days after the acquisition of the patent, without the same ever having had a trial run—the first time the patent was tried out was in July of 1964—to determine whether it was functionally capable of making individually wrapped slices of cheese, was indeed a harassment to force the defendant-company to wrap individu-

al cheese slices for them under its own label. The two allegations in the defendant's motion concerned themselves solely with infringement of the Brandenberger patent and there was no reference whatsoever to the invalidity thereof.

Another contention was that if Borden had been successful in making a deal with Clearfield, if we use the logic attributed to them, it would have been in violation of the Brandenberger patent and it was only when it failed to make a deal with Clearfield that it went out to find a patent which it could use as a lever to force Clearfield into a law suit if it did not gain its end. In other words, it would have been willing to have been an infringer itself if it could have gotten the product from Clearfield.

It was the contention of the defendant at the hearing on the motions for the protective order and summary judgment that to disclose the secret process of the defendant, even if it was held not to be an infringer, would be a lost cause because then the process itself, which was the core of the defendant's business, would have been exposed to the whole world. At a hearing on April 7, 1965, counsel for the defendant, addressing the court, stated as follows: "There are pending three motions, actually, Judge, all by the defendant. One is a motion for a protective order with respect to the taking of depositions by the plaintiff, and that is the one that was noticed for today. There is also pending a motion by the defendant for summary judgment, which motion was just filed last week. There is also pending by the defendant a motion to amend the answer, which was just filed lask week." The court, during the hearing, then inquired, "How strong is your contention that the patent is invalid, distinguished from not being infringed?", and defendant's counsel replied, "We haven't included that in the motion for summary judgment, because that does require evidence that is not in the record." The court then suggested that both counsel go on and argue the motion for summary judgment, even though counsel for the plaintiff said he was not prepared at this juncture of the case to argue it as he had seen it but two days before. However, upon the court saying that it would hear what they had to say and they could file briefs two weeks later, both counsel acquiesced. Neither at this argument nor in the briefs did either counsel resort to the question of the invalidity of the patent, but confined themselves solely to the matter of infringement, as set forth above. At the close of the case it will be noted that the plaintiff had been precluded from having discovery because of the undisposed motion of the defendant for a protective order which, as has been indicated, was to be argued on the day the motion for summary judgment was argued. Nevertheless, the court, in its opinion, after discussing infringement, and twice indicating noninfringement, finally stated, " * * * there must necessarily be a lingering doubt as to infringement, since the process is admittedly secret, and the evidence comes from partisan, though respectable and credited, sources.", and, accordingly, the court without any final determination as to infringement, went directly, sua sponte, to a discussion of the invalidity of the patent and, after considering the prior art, especially the Vogt and Gage patents, Nos. 1,810,740 and 1,654,871, respectively, held that the patent was invalid. Although the file history of the Brandenberger patent was offered, as indicated, at the close of the hearing by the plaintiff (Borden), for the court's benefit as to the alleged infringement, the defendant (Clearfield) contended this made the record available for the disposition of the question of invalidity.

██ It has been clear from an early date, that the court could dismiss a bill because the invention described in the patent was not patentable, even when no defense of invalidity was set up in the answer, Dunbar v. Myers, 94 U.S. 187, 24 L.Ed. 34, and it was later held in Slawson v. Grand St., P. P. & F. R. R. Co., 107 U.S. 649, 652, 2 S.Ct. 663, 666, 27 L.Ed. 576, "Every suitor in such a cause should, therefore, understand that the question

whether the invention, which is the subject matter in controversy, is patentable or not is always open to the consideration of the court, whether the point is raised by the answer or not.", and in Barkeij v. Lockheed Aircraft Corp., 9 Cir., 210 F.2d 1, it was held that the court could dismiss a complaint by ruling the patent invalid without ever even having heard any of the defendant's witnesses, saying it was the duty of the court to dismiss a patent infringement suit when it appeared obvious that the patent was invalid. Accordingly, when a party brings suit on a patent alleging infringement, it is accountable for the validity of the patent and, in the normal course of procedure, it is the better practice that the court consider the validity of the patent before it considers any infringement thereof. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

However, even in the light of this broad power of the court to consider the validity of a patent, before it goes to the question of infringement, nevertheless, we consider that, under the circumstances here obtaining, the refusal of discovery to the plaintiff; the court's direction to counsel to argue the motion for summary judgment which, as has been indicated, went only to the question of infringement; the obvious fact that both counsel were unprepared to argue invalidity and, even if we consider the fact that they should have been prepared, plaintiff was, nevertheless, flatly misled by the defendant, the moving party, in stating to the court that invalidity was not a part of the record since it was barren of any facts relative thereto at argument. All of this placed an extremely heavy burden on the court in the finding of invalidity in the absence of any routine testimony concerning the same, for had the routine procedure been followed, permitting discovery under a protective order, it may well have been that the plaintiff might have shown in the prior art a distinguishing feature in the Brandenberger patent and a lack of complete identity of function with the art obtaining theretofore.

The court, in an examination of the claims of the various patents which it alleges Brandenberger anticipated, relies upon and discusses only two, the Vogt and Gage patents, and finds that the Brandenberger patent anticipated both. However, the Gage patent did not concern itself with thermoplastic products while being wrapped as the same is illustrated by wrapping tamales. The intricate process therein described does not speak of cooling and hardening the product, while being wrapped, as in the Brandenberger patent, with cheese, thus entailing the wrapping of a product entirely different from a thermoplastic one, tamales being a hard substance of ground meat and spices. Thus the process, the wrapping of a thermoplastic product and that of a hard substance, never being in a liquid form nor being cooled nor hardened, requires such technical illumination, by way of testimony, to determine whether or not the Brandenberger patent anticipated the art disclosed in the Gage patent. As to the Vogt patent, the wrapping process seemingly does not envelop the product, ice cream, as the description states in 182a–17, "It will be noted that the material after it has been cut into sections will still be wrapped in paper on four sides and only the two ends will be exposed where the cutting has been done. Thus the blocks or bricks may be picked up and handled without directly contacting with the material and may be stored, conveyed and sold to the customer in this condition. It is, of course, obvious that if desired they may be additionally wrapped after the cutting so as to protect the exposed ends.", but nowhere does it discuss the process of closing the ends for a complete wrapping.

While we are not unmindful that it is not the function of an appellate court to decide on this motion disputed issues of fact, as they should not be disturbed unless clearly erroneous, Rule 52 (a), Federal Rules of Civil Procedure, Stauffer v. Slenderella, 9 Cir., 254 F.2d 127, nevertheless, here we do not so engage, as the findings by the lower court are absent any controversy relative there-

to, on the record, as indicated previously and are based on what, from examination of the drawings alone, is an identity of function and an anticipation of the prior art, which, in our judgment, is an insufficient record.

Since the evidence here is all documentary, this court may make its own findings in connection therewith, as stated in Kiwi Coders Corp. v. Acro Tool & Die Works, 7 Cir., 250 F.2d 562, 568. "Since the evidence in this case is all either documentary or in the form of physical exhibits, we are in as good a position as the trial court to examine it and determine for ourselves whether or not there is infringement of the patent claims in issue. Under these circumstances 'the findings of the District Court are deprived of the degree of finality which would otherwise attach under Rule 52.' Steiner v. Mitchell, 6 Cir., 1954, 215 F.2d 171, 175. See also Falkenberg v. Golding, 7 Cir., 1952, 195 F.2d 482, 486; Lewyt Corporation v. Health-Mor, Inc., 7 Cir., 1950, 181 F.2d 855, 857 certiorari denied 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605."

Suffice it to say, at least, we cannot say, with the degree of certainty requisite therefor, under a motion for summary judgment that, by mere visual examination of the existing prior art, the Brandenberger patent would be obvious to the ordinary worker skilled in the art at the time of the invention. As stated in Sutherland Paper Co. v. Grant Paper Co., 3 Cir., 183 F.2d 926, 935, "Prior art patents, and articles on the subject, were introduced at the trial and are in the record. But we are without the benefit of explicit consideration and adequate analysis of some of the patents which seem to us, on reading, to be close to Dreymann. And we do not think that it can be satisfactorily determined from this record whether Dreymann's patent meets the standards set out in the *Sinclair* case." This case differs from Montmarquet v. Johnson and Johnson, D.C., 82 F.Supp. 469, affirmed 179 F.2d 240 (3rd Cir.), for here, while invalidity was found on a motion for summary judgment, the court

had the benefit there of the affidavit of an expert by way of explanation of the patent. The rule is explicitly stated in Messing v. Quiltmaster Corp., D.C., 159 F.Supp. 181, "However, in order to determine patent validity upon this motion, ' * * * the court must be certain that it does not need any expert testimony or other extrinsic evidence to explain or evaluate the prior art, or to explain the application of complicated patent descriptions to the subject matter of the patent so that by a mere comparison of the patent in suit with the prior art patents the court can comprehend the similarities or differences in the patents, invalidity for lack of invention being so clearly apparent on the face of the patent that no testimony could change that conclusion.' ", quoting Glatt v. Sisco, supra, D. C., 136 F.Supp. 936, at page 937, citing Montmarquet v. Johnson and Johnson, supra, Baker v. Webb, D.C., 112 F.Supp. 394 and Chiplets, Inc. v. June Dairy Products Co., D.C., 89 F.Supp. 814.

Additionally, no finding of fact can be a substitute for the standard "of invention which is the controlling factor." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 156, 71 S.Ct. 127, 95 L.Ed. 162. That standard of invention has been set forth with great clarity in the recent opinion of the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545. Therein, the Court sets out the conditions of patentability under the 1952 Patent Act covering §§ 101, 102 and 103. "An analysis of the structure of these three sections indicates that patentability is dependent upon three explicit conditions: novelty and utility as articulated and defined in § 101 and § 102, and non-obviousness, the new statutory formulation, as set out in § 103." Further, at p. 14, 86 S.Ct. at p. 692, "The section [102] is cast in relatively unambiguous terms. Patentability is to depend, in addition to novelty and utility, upon the 'non-obvious' nature of the 'subject matter sought to be patented' to a person having ordinary skill in the pertinent art." And, further, at p. 17, **86**

S.Ct. at p. 693, "We believe that this legislative history, as well as other sources, show that the revision was not intended by Congress to change the general level of patentable invention. We conclude that the section was intended merely as a codification of judicial precedents embracing the *Hotchkiss* condition, with congressional directions *that inquiries into the obviousness of the subject matter sought to be patented are a prerequisite to patentability.*" (Italics ours.) Again, at p. 17, 86 S.Ct. at p. 694, the Court stated, "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or the non-obviousness of the subject matter is determined." While the Court speaks of the lack of "novelty", it nowhere speaks of the obviousness or non-obviousness of the patent in suit and we hold that the determination by a court of the question of patentability, that is the validity or the invalidity of the same, should follow the rigid requirements of Graham v. John Deere Co., supra, and, in disposing of the question of invalidity here, these standards of invention were not made applicable.

■ Since this case will have to be tried on the merits, we reach no conclusion, on this record, as to invalidity or infringement, this for the reason that, on this record, it does not present a situation "so clearly apparent on the face of the patent that no testimony could change that conclusion." As to infringement, an anomaly presents itself, since the plaintiff alleges that on visual examination of the package, defendant's secret process infringes. This, the defendant contends, is pure speculation, denying that its secret process infringes, but, at the same time, asserts it will not let the plaintiff see it in order to find out. However, with additional discovery, *under a proper protective order* and competent testimony concerning the Brandenberger patent and the prior art, a record can be made

which will evaluate the contentions advanced upon which an intelligent judgment may be rendered. As to the averments in the motion for summary judgment of unclean hands and no probable cause for bringing the infringement action as contended for by the defendant, suffice it here to say, in view of our holding, these are factual causes and factual inferences to be drawn therefrom which must be drawn by the factfinding body and, likewise, are not to be properly disposed of on a motion for summary judgment.

Accordingly, the judgment of the lower court will be reversed and a new trial granted.