George P. BAKER et al., Appellants in No. 19,426,

v.

UNITED TRANSPORTATION UNION, AFL CIO, et al., Appellants in No. 19,427.

Nos. 19426, 19427.

United States Court of Appeals, Third Circuit.

Argued Oct. 19, 1971.

Decided Dec. 30, 1971.

---

Hermon M. Wells, Philadelphia, Pa. (Richard N. Clattenburg, Philadelphia, Pa., on the brief), for appellants in No. 19426 and appellee in No. 19427.

Cornelius C. O'Brien, Jr., Philadelphia, Pa., for appellee in No. 19426 and appellants in No. 19427.

Before ALDISERT, GIBBONS and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

This case is an appeal by the Penn Central Transportation Company and a cross appeal by the bargaining representative of its trainmen, the United Transportation Union, from a decision of the United States District Court for the Eastern District of Pennsylvania, 317 F. Supp. 768. That decision construed the requirement of the Railway Labor Act (45 U.S.C. § 151 et seq.) that once a notice has been filed by a party to a collective bargaining agreement under Section 6 of the Act [1] seeking a change in the pay, rules, or conditions of employment, no changes in the disputed terms can be unilaterally undertaken pending a resolution of the dispute.

The railroad contends that prior to such notice it had established a practice of freely changing the location of physical and instructional examinations and instructional classes throughout its system without consultation with the union. It asserts that even during the pendency of a proper notice for changes in the rules governing location of examinations, the "status quo" required by the Act still permits it to make further shifts in locations. The union disagrees, contending that there was no such practice. Alternatively, they suggest that even if there was a past practice, the freeze envisioned by the Railway Labor Act requires that all locations operating as of the date of the notice must be maintained as part of the status quo.

Although there is dispute in this case about the existence of any practice on

---

1. Section 6 of the Railway Labor Act (45 U.S.C. § 156) provides:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

the part of the railroad at any time, the heart of the controversy is whether the statutory requirement under Section 6 demanding maintenance of pay, rules, and conditions of employment is intended: (1) to permit the railroad to continue a past practice even if it means changes in the actual physical locations of examinations; or (2) to freeze the actual locations open as of the date of the notice in spite of the railroad's past history of freely making changes in these sites.

Between the years 1956 and 1970 the railroad made sixteen changes[2] in medical stations and numerous changes in instructional examination sites.[3] The only provision in the contract dealing with examinations was Rule 1–B–1, which stated:

> When examinations other than physical examinations are given to trainmen,

the Company shall arrange for trainmen to take them without loss of time. The railroad states that for this reason it never consulted the union about the changes it made.

Prior to 1966 the union never complained about the closings nor sought any other contractual arrangement to govern any aspect of the problem. On April 21, 1966, the Brotherhood of Railroad Trainmen, the predecessor of the present union,[4] filed a Section 6 notice with the railroad requesting essentially that trainmen be paid for the time they spent taking the various examinations.[5] Direct negotiations proceeded without agreement and the services of the National Mediation Board were invoked by the union on April 14, 1969.[6] Between April 21, 1966, the date of filing the first Section 6 notice, and March 1, 1970, further changes

2. Medical facilities were closed in the following cities on the following dates: Newark, N.J., 1956; Terre Haute, Ind., 1957; Pitcairn, Pa., 1962; Enola, Pa. Shops, 1962; Sunnyside Yards, New York, N.Y., 1963; Newcastle, Pa., 1964; Cincinnati, Ohio, 1964; 32nd St., Phila., Pa., 1964; Camden, N.J., 1964; Steubenville, Ohio, 1965; Canton, Ohio, 1965; Indianapolis, Ind., 1968; LaSalle St. Dispensary, Chicago, Ill., 1968; 466 Lexington Ave. Dispensary, Grand Central Station, New York, N.Y., 1969; East Rochester, N.Y., 1970; Wilmington Passenger Station, Wilmington, Del., 1970.

3. E. g. Book of rule classes and examinations were discontinued at the following terminals in 1960: Sharpsburg, Pa.; Verona, Pa.; New Kensington, Pa.; Blairsville, Pa. In 1970 further discontinuances took place at Derry, Pa.; Mt. Union, Pa. In 1960, tests for promotion and flagging were discontinued at: Pitcairn, Pa.; Derry, Pa.; South Pittsburgh, Pa.; Shirer Oaks, Pa.; West Brownsville, Pa.; Youngwood, Pa.; Shotsburg, Pa.; Kiskie Jct., Pa.; Verona, Pa.; New Kensington, Pa.; Blairsville, Pa.

4. The Brotherhood of Railroad Trainmen merged with the United Transportation Union on January 1, 1969.

5. The substance of the Section 6 notice read:
   Rule 1–B–1 shall be changed to provide as follows:
   1. Trainmen, who are required to submit to instructions or examinations,

including physical examinations, immediately after having finished work, or just prior to reporting for work, and who do not thereby lose time on their assignments or extra lists, shall be allowed continuous time at their regular hourly rate for the time spent in attending such instructions or examinations.
   2. Trainmen, who are given instructions or examinations, including physical examinations, and as a result thereof lose time on their assignments or extra lists, shall be paid for the time so lost, in lieu of payment as provided in Item 1 hereof.
   3. Trainmen, who are required to submit to instructions or examinations, including physical examinations, at other than the times mentioned in Items 1 and 2 hereof, shall be allowed for the time spent in attending such examinations or instructions a minimum day's pay based on the rate provided for the service in which such trainmen are ordinarily engaged.
   4. Trainmen, who are required to submit to instructions or examinations, including physical examinations, at points other than their home terminal, shall be compensated under the provisions of Rule 4–E–1 or 4–E–4 of the current schedule Agreement for the deadheading performed.

6. Under 45 U.S.C. § 155 when the parties to an agreement governed by the Railway Labor Act cannot adjust their differences in conference, they may invoke the assistance of the Mediation Board.

in the location of examinations took place [7] and incurred no protest from the union. However, on March 2, 1970, the union served the railroad with another Section 6 notice which requested a rule change that would have required the railroad to send trainmen for examinations at their home terminal, or if no examinations were currently held at that terminal, to the one nearest their home.[8]

The union believed that regardless of any past practice, the second Section 6 notice then froze all existing examination sites and prevented their abolition. The railroad, interpreting the meaning of status quo required by Section 6 differently, believed that it could continue what it considered its past practice of changing examination sites without consulting the union pending resolution of the controversy.

On July 17, 1970, the railroad closed its medical facility in the Wilmington, Delaware, passenger station.[9] The union protested the closing as contrary to the requirement that conditions not be altered pending the resolution of the April 1966 and March 1970 notices and threatened to strike the railroad. The railroad sought the services of the National Mediation Board to resolve the dispute surrounding the March 1970 notice and applied to the district court for an injunction against the strike.

The district court not only enjoined the strike but also found that the closing at Wilmington violated the duty of the railroad to " 'preserve and maintain un-changed those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute.' Detroit & Toledo Railroad Co. v. United Transportation Union et al., 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969)." Because of the burden on the railroad and the pendency of the matter before the National Mediation Board, it refused to order any sites reopened but did enjoin any further changes in the location of physical and instructional examinations.

The union has appealed from that decision, contending that the injunction against it should be lifted. The railroad has also appealed on the grounds that there was a past practice of freely changing examination sites; and that the past practice of freely changing examination sites and the proper interpretation of Section 6's status quo provision would permit it to continue making changes in those locations pending resolution of the dispute.

## I.  THE PURPOSE OF THE RAILWAY LABOR ACT

Although American railroads no longer totally dominate this country's freight and passenger transportation industry as they did in 1926 when the Railway Labor Act was passed, they remain the backbone of much of our interstate transportation system. The primary pur-

---

7. From 1966 to March 1, 1970, the following changes took place:
   (1) On April 10, 1968, physical examinations were discontinued at Bellefonte, Pa.
   (2) In 1969 a location for rules examinations was changed from Lock Haven, Pa. to Williamsport, Pa.
   (3) On January 6, 1970, the location for physical examinations was changed from East Brady, Pa. to Butler, Pa.

8. The pertinent part of the March 2, 1970, notice read:
   B. Establish a rule to provide that employees shall not be required to sub-mit to examinations, including physical and instructions at locations other than their home terminal or the terminal nearest their place of residence whichever is nearer.

9. In addition to the closing at Wilmington, Delaware, two other changes took place:
   (1) In late March 1970 Book of Rules instruction site was moved from 30th St., Pittsburgh, Pa. to the Pittsburgh, Pa. passenger station.
   (2) In July 1970 the location for Book of Rules examinations at Derry, Pa. was discontinued.

pose of that legislation [10] was to insure that there would be no interruption of this vital link in our nation's commerce. The Act was designed to "provide a machinery to prevent strikes," Texas & N. O. R. Co. v. Brotherhood of Railway Steamship Clerks, 281 U.S. 548, 565, 50 S.Ct. 427, 432, 74 L.Ed. 1034 (1930), and set·up an elaborate scheme of negotiation, mediation, voluntary arbitration and conciliation to handle major disputes [11] so that the parties could attempt to work out a settlement of their differences without resorting to destructive lock-outs or strikes that would cripple the economy and cause loss of work, goods and services to millions of people. Detroit & Toledo Shore Line R. Co. v. United Transportation Union, supra, 396 U.S. at 148–149, 90 S.Ct. 294; Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 381, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 721–731, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

■ While disputes are not to be talked to death, they are at least intended to be drawn out so that tempers can cool and reason prevail. Detroit & Toledo Shore Line R. Co. v. United Transportation Union, supra, 396 U.S. at 149, 90 S.Ct. 294; Brotherhood of Railway Clerks etc. v. Florida East Coast R. Co., 384 U.S. 238, 246, 86 S.Ct. 1420, 16 L.Ed. 2d 501 (1966). In the time taken to work through the various steps, an ap-

propriate climate can be developed for rational bargaining and public opinion can be "mobilized in favor of a settlement without a strike or lockout." Detroit & Toledo Shore Line R. Co. v. United Transportation Union, supra, 396 U.S. at 150, 90 S.Ct. at 299.

■ As pointed out in the Detroit and Toledo Shore Line case, supra, at 150, 90 S.Ct. 294, if the railroads and their workers are going to be able to resolve their differences peacefully, neither side must resort to self-help. The pay, rules and working conditions that prevail when the Section 6 notice is filed must be maintained and neither side may attempt to use unilateral action to gain what it wants. If the status quo is not rigidly enforced, the statute becomes worthless.

## II. THE PAST PRACTICE

■ It may be a difficult task to ascertain what is the status quo in any particular case. In many labor situations, particularly in the railroads, "where a condition is satisfactorily tolerable to both sides, it is often omitted from the agreement." Detroit and Toledo Shore Line R. Co., supra, at 155, 90 S.Ct. at 302. This omission does not necessarily preclude it from becoming a working condition by acquiescence or by tacit understanding.

The difficulty in finding the status quo is compounded when the working condition alleged to exist is not a fixed contractual condition, like a set rate of

---

10. The general purposes of the Act are stated in 45 U.S.C. § 151a:

The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt

and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

11. Under the Act, a major dispute is one arising out of the formation or change of collective agreements covering rates of pay, rules, or working conditions. Elgin, J. & E.R. Co. v. Burley, 325 U.S. 711, 722–727, 65 S.Ct. 1282 (1945). A minor dispute involves the interpretation or application of a collective agreement and under § 3 of the Act is subject to binding interpretation by the Railway Adjustment Board. Elgin, J. & E.R. Co., supra, at 722–727, 65 S.Ct. 1282.

pay, but is an on-going management prerogative that permits the railroad to change some aspect of its operations, such as the place for physical and instructional examinations of its trainmen. It should be noted that the district court's order does not discuss the existence of any past *practice* on the part of the railroad allowing it to change sites freely.[12] The order, which bars the union from disputing changes in the 1966 to 1970 period because of laches [13] and finds the 1970 changes in violation of the freeze brought about by the March 1970 notice, could be equally well interpreted as a finding that no past practice existed or as a finding that while a past practice existed, the filing of the second Section 6 notice froze the specific locations then in existence.

The record in this case is replete with undisputed documentary evidence that permits us to ascertain the existence or non-existence of the past practice without remanding the case to the district court. Borden Co. v. Clearfield Cheese Co. 369 F.2d 96 (3d Cir. 1966); Soles v. Franzblau, 352 F.2d 47 (3d Cir. 1965). The problem we must consider in advance of dealing with those facts is a determination of the legal standard to be used. The answer revolves around an interpretation of the Supreme Court's mandate in *Detroit & Toledo Shore Line*, supra, which dealt with a railroad's attempt to create a new home terminal for some of its train crews during the pendency of a Section 6 notice. In that case there had previously been nothing in the contract governing the locations to which crews could be assigned, and the first time the railroad had attempted to send men to a new terminal, the union filed a Section 6 notice. Subsequently, the railroad was able to establish a third yard as a home terminal for some crews without protest, but when it tried to assign men once again to the second terminal, it was met with another Section 6 notice. The Court, in an opinion written by Jus-

---

12. The pertinent conclusions of law in the district court's order read:

(6) The changes in location of physical and rules examinations and rules classes constituted a change in working conditions within the purview of the Railway Labor Act.

(7) Even were we to conclude that the changes made by the Company between April 21, 1966, and March 2, 1970, were violative of Section 6 of the Act, the Union, by seeking no judicial action until this time may not be permitted to force the Company to re-establish prior locations that have been out of existence for a period of eight months to two years.

(8) The changes in location instituted by the Company subsequent to the Union's March 2, 1970, Section 6 notice violated Section 6 of the Act. These changes were directly related to the Union's notice and violated the duty of the Company "to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." Detroit & Toledo Shore Line Railroad Company v. United Transportation Union et al., 396 U.S.

142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). Nevertheless, we feel that at this time, while the dispute is still pending before the National Mediation Board, the Company should not be made to reopen the prior locations. To force it do so would be to impose too severe a burden, and under equitable principles we decline to so act.

(9) Any further changes in location by the Company would be in violation of Section 6 of the Act and should be enjoined.

13. The district court did not make a finding as to whether the April 1966 notice was so closely related to the matter of changing locations that under the Section 6 status quo any changes after its filing might have been a violation of the Act. We see no merit in this contention of the union and dismiss it without further consideration. The Act requires only that those matters involved in the Section 6 notice remain unaltered. The April 1966 notice asked for adjustments in pay when taking examinations and instruction, but even broadly conceived, it seems too great a stretch of the imagination that a request for pay should affect the railroad's ability to change the location of those instructions and examinations.

tice Black, held that on the facts before it, there had been no prior practice of making assignments to the second terminal, and the railroad was prevented from such action during the pendency of the notice. On the other hand, Justice Black stated that "the mere fact that the collective agreement before us does not expressly prohibit outlying assignments would not have barred the railroad from ordering the assignments that gave rise to the present dispute if, apart from the agreement, *such assignments had occurred for a sufficient period of time* with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions." (id. 396 U.S. at 153–154, 90·S.Ct. at 301) (emphasis ours)

██ Therefore, when the railroad has engaged in certain activity over a sufficient period of time for the union to become aware of it and react accordingly if it objects, such past activity by the railroad absent objection by the union can become part of the actual status quo. If, in the course of such railroad activity, the union timely objects to it, or requires that the railroad act in concert with it in the exercise of such practice, then it does not become a prerogative to be exercised unilaterally by the railroad. However, when the union and its members are well aware of the railroad activity over a period of time and make no effort to have it discontinued, they must be deemed to have acquiesced in its exercise. Cf. United Transportation Union v. St. Paul Union Depot, 434 F.2d 220, 222 (8th Cir. 1970). Cert. den. 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971).

██ In this case, the union contends that even if there is sufficient evidence to show that the railroad regularly changed sites for instructions and examinations, the union made no effort to arrest the changes because they were all satisfactory to its members up to 1966. On this ground, it contends that it was in fact passing on each and every change, and that on the basis of the evidence the court should find that the railroad can only make further changes with the direct sanction of the union.

This line of argument is specious. It attempts to spell out after the event a right to consent to future changes on the basis of its failure to dissent to past changes. This conclusion neither follows logically nor practically. Were we to accept it, no prior practice could ever be established which would permit management or union to act unilaterally. The acceptance of the union's argument would lead to the illogical result of automatically awarding veto powers over future operational action of the railroad because of the union's failure to assert objections in the past. It obviously flies directly in the face of the requirement that no prior pay, rules or working conditions be altered during the dispute. Furthermore, the Section 6 notice filed in 1966 did not object to changes in sites but only requested that trainmen be paid for the time spent in taking the examinations.

Therefore, we find that the railroad has made out a convincing case on the record that they had established a practice of freely changing instruction and examination sites prior to the filing of the Section 6 notice without the consent of the union. The numerous changes, which the union concedes were brought to its attention, without a word of dissent from any employee representative, leave us with no alternative but to conclude that the practice asserted by the railroad did in fact exist.

### III. THE EFFECT OF THE SECTION 6 NOTICE

██ The union argues that even if we find that such a practice did exist, once the Section 6 notice has been filed, the specific sites in existence are frozen and management can no longer exercise the prerogative. It contends that in spite of the language of the majority opinion in *Detroit and Toledo Shore Line R. Co.*, supra, recognizing that a working condition not barred by contract can be created by knowing acquiescence over suffi-

cient period of time by employees, Justice Harlan who concurred in part and dissented in part, was correct in finding that the majority intended to freeze physical conditions in existence on the day the Section 6 notice was filed. We disagree. It would make no sense to suggest that changes over a period of time are even relevant in determining the status quo if in its determination all physical conditions are to be fixed automatically by those in existence on the date of the filing of the Section 6 notice.

The only case to meet this issue squarely is United Transportation Union v. St. Paul Union Depot, supra. It held that where a company had a prior practice of freely changing job assignments, it could continue to do so after the filing of a Section 6 notice on the subject. The union in this case advances much the same argument it made in *St. Paul Depot* (434 F.2d at 221), essentially asking us not to follow that case's teaching in this circuit. We believe that the case was properly decided and conclude that its rationale should be applied here.

As the Supreme Court noted in *Detroit and Toledo Shore Line R. Co.,* the mere fact that a prerogative is not included in the written agreement between union and management does not affect the possibility that it well may be a part of the working conditions that both sides expect will continue to be enforced during the pendency of a Section 6 freeze. If management had had the ability of freely changing examination sites before the notice, depriving it of that ability and requiring that it continue examination sites then in existence throughout the long, deliberately drawn out process of negotiations and mediation under the Act, would not be a continuation of any prior existing condition. It would be the creation of a new condition.

The judgment of the district court in No. 19426 will be reversed and the judgment in No. 19427 will be affirmed.

* ▮ Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of