**RAILWAY LABOR EXECUTIVES' ASSOCIATION, Plaintiff,**

v.

**PITTSBURGH & LAKE ERIE RAILROAD COMPANY, Defendant.**

Civ. A. No. 87–1745.

United States District Court, W.D. Pennsylvania.

Nov. 24, 1987.

As Amended Dec. 21, 1987.

John Clark, Washington, D.C., Stanley Greenfield and Graydon R. Brewer, Pittsburgh, Pa., for plaintiff.

Richard Wyatt, Jr., Washington, D.C., G. Edward Yurcon, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

BLOCH, District Judge.

Presently before this Court are plaintiff's motion for summary judgment and defendant's motion to dismiss. Both motions raise a single legal issue, i.e., whether the provisions of the Railway Labor Act (RLA), 45 U.S.C. § 151, *et seq.*, governing resolution of labor disputes are applicable in the instant matter. For the reasons set forth in this opinion, the Court concludes that the RLA is applicable. Accordingly, plaintiff's motion for summary judgment is granted and defendant's motion to dismiss is denied.

### Factual Findings

Plaintiff, Railway Labor Executives' Association (RLEA), is an unincorporated association of the chief executive officers of 19 labor organizations which are "representatives" as that term is defined in § 1, Sixth, of the RLA. These labor organizations collectively represent virtually all of the employees of defendant, Pittsburgh and Lake Erie Railroad (P & LE), and have collective bargaining agreements with P &

LE which cover various crafts and classes of P & LE employees.

P & LE owns and operates a 182–mile rail line which runs from Connellsville, Pennsylvania to Youngstown, Ohio. P & LE is a rail carrier within the meaning of § 1, First, of the RLA. On July 8, 1987, P & LE entered into a sales agreement with P & LE Railco, Inc. (Railco), a subsidiary of Chicago West Pullman Transportation Corporation. When finalized, this agreement will result in Railco's purchase of all of P & LE's rail lines and certain of its operating properties. P & LE employs approximately 750 people whose jobs will be affected by the sale.

By letter dated July 31, 1987, Gordon E. Neuenschwander, president and chief executive officer of P & LE, notified P & LE employees that the carrier had entered into the aforesaid sales agreement. Beginning in August, 1987 and continuing into September, 1987, RLEA member organizations served notices on P & LE pursuant to § 6 of the RLA stating their position that the sales transaction could not be completed in the absence of negotiations between P & LE and the representatives of its employees, pursuant to the terms of the RLA.

P & LE responded to these § 6 notices by stating that it was the railroad's position that the notices were not valid under § 6 of the RLA since the proposed transaction is controlled by the Interstate Commerce Act (ICA) and is subject to the authority of the Interstate Commerce Commission (ICC).

On October 14, 1987, the Brotherhood of Maintenance of Way Employees (BMWE), one of plaintiff's member organizations, invoked the services of the National Mediation Board (NMB) under § 5, First, of the RLA to help resolve the dispute between the BMWE and P & LE which had arisen out of the § 6 notice which BMWE had served on P & LE on August 14, 1987.

There is no dispute between the parties that the dispute resolution procedures set forth in the RLA have not been completed within the context of the present dispute.

## Discussion

### A. Railway Labor Act

In enacting the RLA, Congress endeavored to promote stability in labor management relations within the railroad industry by providing effective and efficient remedies for the resolution of railroad employee disputes arising out of the interpretation of collective bargaining agreements. *Union Pacific Railroad Company v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402–03, 58 L.Ed.2d 354 (1978) (per curiam). The RLA subjects all railway disputes to "virtually endless" negotiation, mediation, voluntary arbitration, and conciliation. *Detroit and Toledo Shore Line Railroad Company v. Transportation Union*, 396 U.S. 142, 148–49, 90 S.Ct. 294, 298–99, 24 L.Ed.2d 325 (1969). In addition, the RLA requires all parties to "exert every reasonable effort to make and maintain" collectively bargained agreements, § 2, First, and to abide by the terms of the most recent collective bargaining agreement until all the dispute resolution procedures provided by the RLA have been exhausted. §§ 5, 6, and 10; *Burlington Northern Railroad Company v. Brotherhood of Maintenance of Way Employees*, —— U.S. ——, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987).

When the nature of a dispute under the RLA is "major," neither party may change the status quo without complying with the procedures set forth in the Act. 45 U.S.C. § 156. A major dispute is one arising out of the formation or change of collectively-bargained agreements covering rates of pay, rules or working conditions. *Baker v. United Transportation Union*, 455 F.2d 149, 154 (3d Cir.1971); *see also Elgin, J. & E. Railroad Company v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

The RLA provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2, Second, and if the conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services

*sua sponte* if it finds a labor emergency to exist. § 5, First.

If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5, First, and 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute between the parties is working its way through these stages, neither party may unilaterally alter the status quo. §§ 2, Seventh, 5, First, 6, and 10; *Railroad Trainmen v. Terminal Company*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969); *see also Detroit and Toledo Shore Line Railroad, supra*, at 149, n. 14, 90 S.Ct. at 298 n. 14.

### B. *Interstate Commerce Act*

The Interstate Commerce Act, 49 U.S.C. § 10101, *et seq.*, vests in the ICC the authority to regulate entry into and exit from the railroad business. The ICA gives the ICC the authority to consider the effect of an ICC approved transaction, such as a sale or merger of railway lines, on the railroad's employees. In the context of such transactions, the ICC has the authority to impose labor-protective provisions.[1] In some instances, the imposition of labor-protective provisions is mandatory, for example, in certain mergers and consolidations. 49 U.S.C. § 11347. In other situations, imposition of labor-protective provisions rests with the discretion of the ICC, e.g., where a rail carrier proposes to construct or operate a new railroad line. 49 U.S.C. § 10901.

Certain transactions concerning railroads can be exempted from the requirements of the ICA altogether. Title 49 U.S.C. § 10505 grants the ICC the authority to exempt a transaction or service from the requirements of the ICA, when ICC regulation is not necessary to carry out the policies of Congress as stated in § 10101a of the ICA.

In 1985, the ICC, exercising its authority to exempt pursuant to § 10505, adopted final rules exempting from regulation all acquisitions and operations under 49 U.S.C. § 10901, with certain limited exceptions not applicable in the instant case. *Ex Parte No. 392 (Sub–No. 1), Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. § 10901*, 1 I.C.C.2d 810 (1985).

The most significant aspect of the *Ex Parte 392* rule making, for present purposes, is the ICC's determination that labor protective provisions would virtually never be imposed upon transactions granted an exemption under its provisions. In reaching this conclusion, the ICC stated that the imposition of labor protective conditions on acquisitions and operations under § 10901 could seriously jeopardize the economics of continued rail operations and result in the abandonment of property with the attendant loss of both service and jobs on the line. The ICC further found that if labor protective conditions were imposed, the economic justification for the sale would be diminished, if not negated.

Although the essence of *Ex Parte 392* is that labor protective provisions should be avoided, the ICC did state that "in an extraordinary case ... if an exceptional showing of circumstances justifying the imposition of labor protection is made," a protesting labor union may obtain protective provisions. The means by which a union may seek such labor protective provisions in connection with the transaction exempted pursuant to *Ex Parte 392* is by filing a petition with the ICC to revoke the exemption. A petition to revoke does not automatically stay the exemption, however. 49 C.F.R. § 1150.32.

---

1. An example of the types of conditions which may be imposed are the so-called "New York Dock" conditions, which generally are imposed in merger situations. The New York Dock conditions include 6 years of wage guarantees, moving allowances, retraining expenses, and the option of lump sum severance payments.

On September 19, 1987, Railco filed a notice of exemption with the ICC under the *Ex Parte 392* procedures. RLEA filed a petition for a stay, a petition for rejection of the P & LE Railco filing, and a complaint seeking an order preventing consummation of the sale. RLEA did not file a petition to revoke the exemption.

In an opinion dated September 25, 1987, and served September 29, 1987, the ICC denied RLEA's request for a stay and declined to consider the imposition of labor protective provisions, finding that RLEA had not offered sufficient evidence to show it was likely to prevail on the merits and that it had failed to show irreparable harm absent a stay. Consequently, the *Ex Parte 392* exemption took effect.

## C. *Analysis*

The issue presented for this Court's resolution is a purely legal one: whether the ICC's exemption of the P & LE sale transaction pursuant to *Ex Parte 392* and § 10505 of the ICA operates to relieve P & LE of the obligations imposed upon it by § 6 of the RLA.

P & LE argues that when the ICC granted the *Ex Parte 392* exemption and declined to impose labor protective provisions, the effect was to abrogate the provisions of the RLA governing labor disputes for the purposes of this sale transaction. P & LE contends that requiring it to negotiate with its unions over the effects of the sale would directly conflict with the ICC's order approving exemption.

RLEA's contention is that, pursuant to the RLA, it has certain statutorily conferred rights to negotiate with the carrier where a change in rates of pay, rules or working conditions is imminent. RLEA contends that the sale transaction amounts to such a change, thereby obligating P & LE to bargain concerning the effects of the sale on its employees and the collective bargaining agreements.

As noted, the authority granted to the ICC by § 10505 of the ICA is limited to exemption from the requirements of the ICA itself. Section 10505 reads in pertinent part that "the commission shall exempt a person, class of persons, or a transaction or service when the commission finds that the application of a provision of this subtitle ... is not necessary to carry out the transportation policy of § 10101a of this title...." The reference to "this subtitle" within § 10505 denotes the ICA, Subtitle IV of Title 49, United States Code.

The ICC has no express authority pursuant to § 10505 to exempt a transaction such as the instant one from the requirements of any other federal statute, e.g., the RLA. Thus, in effect, when the ICC exempts a transaction pursuant to § 10505, as is the case in *Ex Parte 392* proceedings, the ICC is doing nothing more than relieving the carrier of its obligation to comply with otherwise applicable requirements of the ICA.

The Court finds it highly significant that under a different portion of the ICA than that which is applicable here, i.e., 49 U.S.C. § 11341, Congress did expressly provide the ICC with the authority to exempt transactions subject to ICC approval from the application of other federal laws. Section 11341 of the ICA provides that a transaction exempted by the ICC pursuant to subchapter 3 of Chapter 113 is also exempt "from all other law, including state and municipal law, as necessary to let that person carry out the transaction...." There is no similar statutory provision exempting the type of transaction at issue in the instant case from requirements of other federal laws, such as those imposed by the RLA. The fact that Congress saw fit to exempt certain Chapter 113 transactions from other federal laws suggests that, in the absence of such an express exemption applicable to the type of transaction at issue here, the Court should not presume that Congress intended to grant the ICC the authority to relieve rail carriers of their obligations to comply with the RLA.

P & LE argues, in effect, that the intent of Congress to exempt transactions such as the instant one from the requirements of the RLA can be implied. In support of this argument P & LE notes the policies articulated by the ICC in its *Ex Parte 392* decision, i.e., the interest in furthering the eco-

nomic viability of this country's "marginal" rail lines. P & LE, however, is unable to cite any authority to attribute to Congress the intention to abrogate the provisions of the RLA. P & LE's argument reduces to the contention that Congress, by granting the ICC the authority to exempt certain transactions pursuant to § 10505 of the ICA, intended to repeal the RLA by implication.

This Court should decline to read two apparently conflicting federal statutes as being in irreconcilable conflict if it is at all possible to do otherwise. *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981). Courts must read statutes to give effect to each if this can be done while preserving their respective sense and purpose. *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). Repeals by implication are not favored. The intention of the legislature to repeal must be "clear and manifest." *Watt, supra*, 451 U.S. at 267, 101 S.Ct. at 1678 (*quoting United States v. Borden Company*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939)).

P & LE argues that Congress' intent to abrogate the RLA can be inferred from the broad authority granted the ICC by Congress in connection with the regulation of the railroad industry. In effect, P & LE is arguing that the ICC's power is so sweeping in nature as to override previously enacted, valid federal statutes. The authority cited for this proposition is meager, however. *Chicago and North Western Transportation Company v. Kalo Brick and Tile Company*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981), does not address the preemptive effect of the ICA vis-a-vis another federal statute. Rather, the *Kalo* case deals with a conflict between state authority and the authority granted the ICA pursuant to the commerce clause of the United States Constitution. Moreover, the case does not deal with a labor dispute. Therefore, its reasoning is inapposite.

As the Supreme Court has noted in *McLean Trucking Company v. United States*, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944), Congress has vested the ICC with broad discretion and has charged it with the duty "to execute stated and specific statutory policies." That delegation, however, does not include either the duty or the authority to administer or execute numerous other laws. Rather, "the Commission's task is to enforce the Interstate Commerce Act and other legislation which deals specifically with transportation facilities and problems. That legislation constitutes the immediate frame of reference within which the commission operates; and the policies expressed in it must be the basic determinants of its action." *McLean Trucking Company*, at 79–80, 64 S.Ct. at 377. (*See also St. Joe Paper Company v. Atlantic Coast Line Railroad Company*, 347 U.S. 298, 74 S.Ct. 574, 98 L.Ed. 710 (1954) (holding that Congress has consistently refused to grant the ICC broad ranging powers in the context of mergers and acquisitions)).

This Court concludes that the mere fact that Congress has granted the ICC broad authority to regulate the transportation industry cannot be read to imply that Congress intended to annul the provisions of the RLA, particularly in light of the strong Congressional policies underlying the RLA, *Union Pacific Railroad Company v. Sheehan, supra*. Moreover, the fact that Congress did see fit to grant an express exemption from other federal laws where the ICC approves a transaction pursuant to § 11341 of the ICA suggests that Congress did not intend to grant the ICC the authority to override such laws in other contexts, e.g., § 10901 transactions exempted pursuant to *Ex Parte 392*.

The case of *Railway Labor Executives' Association v. Staten Island Railroad Corporation*, 792 F.2d 7 (2nd Cir.1986), is clearly distinguishable from the instant case. In *Staten Island*, the ICC had approved the sale of a railroad, and had declined to impose labor protective conditions on the sale. RLEA sought injunctive relief directing the carrier to comply with the provisions of the RLA. The Circuit found that there was no relief which the federal courts could grant and, therefore, upheld dismissal of the case.

The Circuit's decision rests on two bases. First, in approving the sale transaction, the ICC had mandated that the transaction take place. Its order provided that the seller *"must* complete the sale so long as [the buyer] consummates." 792 F.2d at 12 (emphasis supplied by the Circuit). Thus, the Circuit found, an order directing the parties to engage in negotiations pursuant to the RLA would directly conflict with enforcement of the ICC order because it would render impossible consummation of the transaction as contemplated by the ICC.

Moreover, and more importantly, by the time RLEA came into court seeking injunctive relief in the *Staten Island* proceeding, the sale had taken place. Therefore, the status quo had been altered and the issuance of an injunction for the purpose of preserving the parties' positions as they existed at the time the dispute arose would have been a pointless exercise. Once the sale had taken effect, the only means by which the Court could have given effect to the RLA dispute resolution procedures would have been to direct the unraveling of the sale transaction, which it clearly was unwilling to do, particularly in light of the fact that once the sale had taken place the seller had relinquished all authority to operate a rail system under the ICA.

The circumstances of the case at hand are significantly different than those presented to the Second Circuit in *Staten Island.* First, the ICC's order does not mandate that the sale of P & LE take place. Rather, it simply authorizes the parties to proceed with the sale without the restrictions which normally would be applicable pursuant to the provisions of the ICA. Second, the sale has not taken place. Therefore, there is relief which this Court can grant by way of an injunction to preserve the status quo. Under these circumstances, there is no unavoidable conflict between the RLA and the ICA; the provisions of the two statutes can be harmonized, giving effect to the purposes of each. *Watt v. Alaska, supra.*

There appears to be little argument that the dispute at hand constitutes a "major"

dispute within the meaning of the RLA. *Baker v. United Transportation Union,* 455 F.2d 149 (3d Cir.1971). Therefore, P & LE may not alter the status quo without complying with the procedures of the RLA, and, specifically, with the procedures of § 6 of that Act. *United Transportation Union v. Penn Central Transportation Company,* 505 F.2d 542 (3d Cir.1974). The status quo consists of the rates of pay, rules and working conditions that prevail at the time a § 6 notice is filed. *Baker, supra.*

This Court previously has ruled that P & LE has no obligation to negotiate concerning its decision to sell a substantial portion of its operation. *First National Maintenance Corporation v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). P & LE, however, does have the duty to bargain over the effects of its decision to sell. *First National Maintenance, supra; United Industrial Workers v. Board of Trustees of the Galveston Wharves,* 351 F.2d 183 (5th Cir.1965). In *Galveston Wharves,* the Fifth Circuit stated that it "assumed that an employer had the legal right to go out of business. But under the Railway Labor Act when it does so during the term of the agreement it is such a change in 'working conditions' that under § 6 and § 2 [of the RLA] it must give notice." 351 F.2d at 190.

There is no dispute that, although RLEA has served § 6 notices upon P & LE and, further, has invoked the services of the National Mediation Board pursuant to § 5, First, of the RLA, P & LE has refused to participate in the dispute resolution procedures under the RLA. P & LE has a duty to negotiate in good faith with the representatives of its employees.

In summary, the Court concludes that there is no statutory basis for defendant's contention that the ICC has the authority to override the dispute resolution mechanisms of the RLA or that enforcement of the RLA mechanisms would conflict with the ICC's order. P & LE has failed to convince the Court that an intent to grant such sweeping authority to the ICC can be inferred from § 10505 of the ICA. The RLA is a validly enacted federal statute

which this Court must enforce in the absence of a clear indication that Congress intended otherwise. P & LE is obligated to comply with its provisions.

An appropriate Order will be issued.

## ORDER

AND NOW, this 24th day of November, 1987, upon consideration of Defendant's Motion to Dismiss filed in the above captioned matter on September 30, 1987, IT IS HEREBY ORDERED that said Motion is DENIED.

AND, further, upon consideration of Plaintiff's Motion for Summary Judgment filed in the above captioned matter on November 16, 1987, IT IS HEREBY ORDERED that said Motion is GRANTED.

IT IS FURTHER ORDERED that the Defendant comply with the provisions of the Railway Labor Act concerning resolution of the major dispute at issue.

IT IS FURTHER ORDERED that Defendant is enjoined from altering the rates of pay, rules and working conditions in existence at the time the § 6 notices were given.

IT IS FURTHER ORDERED that the sale of Defendant's assets is enjoined to the extent that such sale does not include provisions for the maintenance of the status quo, that is, provisions prohibiting the alteration of the rates of pay, rules and working conditions existing at the time § 6 notices were given. The injunction hereby ordered shall remain in effect until such time as the dispute resolution procedures set forth in the Railway Labor Act have been completed.